**WEST TEXAS UTILITIES COMPANY and Central Power and Light Company**

v.

**TEXAS ELECTRIC SERVICE COMPANY and Houston Lighting and Power Company.**

No. CA3–76–633–F.

United States District Court, N. D. Texas, Dallas Division.

Jan. 30, 1979.

Order Filed May 15, 1979.

Richard E. Powell, Richard G. Ferguson, Michael I. Miller, Thomas G. Ryan, David M. Stahl, Isham, Lincoln & Beale, Chicago, Ill., Stan McMurry, Rain Harrell Emery Young & Doke, Dallas, Tex., for plaintiffs.

M. D. Sampels, Robert Woolridge, F. K. Slicker, Worsham, Forsythe & Sampels, Dallas, Tex., J. A. Gooch, Cantey, Hanger, Gooch, Collins & Munn, Fort Worth, Tex., for defendant Texas Elec. Service Co.

H. Dudley Chambers, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., E. W. Barnett, T. F. Weiss, Jr., J. G. Copeland, Baker & Botts, Houston, Tex., for defendant Houston Lighting and Power.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

This case involves the interconnected group of electric utilities companies serving the vast majority of the electric consumers in the State of Texas. Plaintiffs, two intrastate[1] Texas electric utility companies which are part of a holding company that also owns other interstate electric utility companies, have sued under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, two other Texas intrastate electric utilities with whom plaintiffs are interconnected claiming that the defendants conspired to restrict their transmission of electric power to intrastate commerce. This conspiracy allegedly prevented plaintiffs from exchanging power with their interstate holding company counterparts through the use of defendants' transmission lines, at an estimated loss to the holding company of 2.2 billion dollars over the next twenty years. Plaintiffs seek an injunction permanently restraining this alleged conspiracy, restraining any enforcement of any written or oral contractual provision prohibiting the flow of electric energy in interstate commerce, and restraining defendants from discon-

---

1. Definition of terms used in this opinion:

*bulk transmission system*: higher voltage and higher capacity lines tying together power plants and serving major loads going to interconnections

*closed connection*: switch is closed and power can flow over the interconnection between the two systems

*distribution line*: serves local loads

*generation*: the production of electricity

*intrastate*: electric utilities operating in such a manner that electric energy does not cross state lines

*interstate*: electric utilities operating in such a manner that electric energy is either transmitted or received across state lines

*open interconnection*: switch at the interconnection is open with no power or energy being able to flow over the interconnection

*parallel operation*: virtually the same as synchronous operation

*radial line*: "single feed"—one electric line to a town; two transmission lines to a town would be "dual feed"

*reserve*: two types of electric energy reserve
*spinning reserve*—reserve that a utility has on line at any time
*capacity reserve*—total generation of the capacity of the utility system less expected peak demand (the maximum amount of energy demand on the system during the year), or reserve above the peak demand of generation

*synchronous operation*: means two or more electric utilities systems interconnected with the generators operating in synchronism with each other

*transmission line*: serves bulk power supply

necting their systems from the plaintiffs' systems.

Defendants have asserted a number of defenses, including: (1) the intrastate method of operation is specifically permitted by Federal Power Act 16 U.S.C. § 824(b); (2) defendants had no anticompetitive intent; (3) any actions by defendants had no anticompetitive effect upon the plaintiffs; (4) defendants' conduct was reasonable; and (5) defendants acted independently and not in conspiracy. Defendants also question plaintiffs' motive for filing this suit in an effort to undermine the credibility of the testimony presented by the plaintiffs. Defendants introduced evidence suggesting that plaintiffs filed this suit to ensure the interstate exchange of power between the members of plaintiffs' holding company. This exchange of power is required by federal law which permits utility holding companies only if they are integrated systems. The SEC, charged with enforcing this provision, had permitted the holding company to operate without continuous interstate flow of power until 1974, when various municipal power companies filed a suit with the SEC challenging the holding company status of plaintiffs' holding company. Defendants note that this proceeding is only one of a number of proceedings instituted by the plaintiffs or which involve similar issues. These proceedings include:

FPC Docket # E-9558—CSW's request to FPC to order maintenance of interstate operations with ERCOT;

PUC Docket # 14—Request by Defendants and others to PUC to have PUC order reestablishment of pre-May 4, 1976, mode of operation;

U.S. District Court, Western District Texas, Austin Division—Suit filed by CPL/WTU objecting to PUC interim order under Docket # 14 reestablishing interconnections in Texas as they were before May 4, 1976;

SEC Docket # 3-4951—Oklahoma cities filed motion with SEC requesting SEC review CSW holding company status;

NRC Docket Nos. 50-498-A and 50-499-A—CPL's request to NRC to conduct antitrust hearing as part of construction permit proceedings before NRC involving South Texas Nuclear Project; and

FPC (FERC) Docket Nos. E-9593 and E-9578—CSW's request for joint hearings with PUC and proceeding to determine if TPL engages in interstate commerce.

The Court held a seven week non-jury trial commencing October 2, 1978. The Court renders the following memorandum decision, supplemented with additional findings contained in an appendix.

### THE PARTIES

All of the parties to this proceeding are electric utilities engaged in the generation, transmission, distribution and sale of electric energy. None of the parties' facilities used in the generation, transmission, distribution or sale of electric energy are located outside the State of Texas.

### PLAINTIFFS

West Texas Utilities Company (WTU) and Central Power & Light (CPL) are wholly owned subsidiaries of Central and South West Corporation (CSW), a registered public utility holding company under the provisions of the Public Utility Holding Company Act of 1935. 15 U.S.C. § 79 et seq. CSW also owns all of the capital stock of Public Service Company of Oklahoma (PSO) and Southwestern Electric Power Co. (SWEPCO), electric utilities operating in the States of Oklahoma, Arkansas, Louisiana and portions of East Texas.

WTU provides electric service to customers of central West Texas, an area including 167 communities, farms, ranches, and 18 electric cooperatives located in 53 counties. The cities of Abilene and San Angelo are the largest metropolitan centers served by WTU, and the company serves a total population of approximately 520,000. In 1977 WTU owned and operated 10 electric generating plants having a total net generating capability of 1,054 megawatts. That year the WTU system experienced a peak load of

758 megawatts for a reserve of 296 megawatts (see appendix C for a map of the WTU service area).

CPL provides electric service to customers in the Rio Grande Valley and the Gulf Coast regions of Texas in an area that includes 212 communities and adjacent and rural areas, seven rural electric cooperatives and two municipal electric systems in 45 counties. The cities of Corpus Christi, Laredo and Victoria are the largest metropolitan centers served by CPL and the company serves a total population of 1,200,000. In 1977 CPL owned and operated nine electric generating plants having a total net generating capability of 3,044 megawatts. That year the CPL system experienced a peak load of 2,323 megawatts for a reserve of 721 megawatts (see appendix B for map of the CPL service area).

WTU has historically operated its system as two divisions, with the "Northern Division" being interconnected with PSO, operating in the State of Oklahoma and the "Southern Division" interconnected with TESCO and other members of the Texas Interconnected Systems (TIS) and the Electric Reliability Council of Texas (ERCOT).

The TIS is a voluntary membership organization consisting of the major bulk electric power suppliers in Texas, including DPL, TESCO, TPL, HLP, CPL, Austin, CPSB, LCRA, TMPA and WTU.[2] The primary purpose of TIS is to ensure maximum reliable electric service through coordination of planning of operations.

ERCOT was created in July, 1970 and is one of nine regional electric reliability councils forming the National Electric Reliability Council (NERC) (see appendix D).

The northern division of WTU, through its interconnection with PSO, operated in electric synchronism with PSO and other members of the Southwest Power Pool (SWPP). The two divisions were designed so as to permit occasional interchange of power, in part to permit CSW to satisfy the provisions of the 1935 Holding Company Act.

DEFENDANTS

Texas Electric Service Co. (TESCO) is a wholly owned subsidiary of Texas Utilities (TU), a holding company which also owns all of the capital stock of Texas Power & Light (TPL) and 99.6% of the capital stock of Dallas Power & Light (DPL). TESCO provides electric service in North Central and West Texas, including the Cities of Fort Worth, Wichita Falls, Midland, Odessa, Arlington, Grand Prairie and 68 other incorporated municipalities, with a total population of approximately 4,000,000.

TPL, not a party to this suit, provides electric service in portions of 51 counties in North Central and East Texas, including the Cities of Irving, Waco, Tyler, Mesquite, Richardson, Killeen, Temple, Sherman, Denison, Paris, Lufkin, Brownwood and 249 other incorporated municipalities. DPL provides electric service primarily in Dallas County. TESCO, TPL and DPL are separate corporate entities with their own officers and boards of directors (see appendix B for a map of the TESCO, TPL and DPL service territories, and Appendix C for a more accurate depiction).

Houston Lighting and Power (HLP) is a wholly owned subsidiary of Houston Industries, Inc., and serves an area of approximately 5,000 square miles in the Texas Gulf

2. Definitions of abbreviations used in this opinion:
"CSW": Central and South West Corporation
"CPL": Central Power and Light Company
"WTU": West Texas Utilities Company
"PSO": Public Service Company of Oklahoma
"SWEPCO" or "SWEP": Southwestern Electric Power Company
"TU": Texas Utilities Company
"DPL": Dallas Power and Light Company
"TESCO": Texas Electric Service Company
"TPL": Texas Power and Light Company
"HLP": Houston Lighting and Power Company

"TIS": Texas Interconnected Systems
"ERCOT": Electric Reliability Council of Texas
"SWPP" of "SPP": Southwest Power Pool
"FPC": Federal Power Commission
"FERC": Federal Energy Regulatory Commission
"PUC": Texas Public Utility Commission
"SEC": Securities and Exchange Commission
"CPSB": City Public Service Board of San Antonio, Texas
"AUSTIN": City of Austin, Texas
"LCRA": Lower Colorado River Authority
"TMPA": Texas Municipal Power Agency

Coast region in which are located Houston, Galveston and 152 smaller cities and towns. In 1977, the peak load for the HLP system was 8,645 megawatts, with a total net generating capacity of 10,170 megawatts for a reserve of 1,525 megawatts (see appendix B for a map of the HLP service territory).

## ELECTRICITY

Electricity is consumed the instant it is produced, and electric generators are designed to respond instantaneously to changes on demand. For example, each time an electric appliance is turned on, demand for electricity increases; and, conversely, every time an electric appliance is turned off, demand decreases. Each minute increase or decrease in demand requires the generators producing the electricity to produce more or less electricity as required.

Once electricity is produced the producer loses all effective control over it, since electricity moves by the forces of physics over wires connected from the generator to its point of consumption following the path of least resistance and in total disregard for who owns the path or who produced the electricity. Electricity is unique as a commodity because it cannot be seen, branded, traced, accumulated, stored or confined and is consumed the instant it is produced. Electric utility companies are also unique in that they must be ready to meet demand for services continuously, although electricity cannot be stored or inventoried. To provide this service, electric utilities must maintain reserve generating capacity in the form of both installed capacity and spinning reserve.

While this reserve can be maintained by each individual company, the electric utilities in the United States have developed interconnections between each other in order to assure greater reliability in the case of sudden emergencies, to permit the reduction of the total amount of installed reserves among the interconnected companies and to permit the exchange of electric power between interconnected or adjacent utilities. Electric interconnections between non-affiliated companies is an accepted industry wide practice but requires careful study and evaluation before they are installed. Interconnections between non-affiliated electric utilities give added assurance to both systems that an adequate, efficient and reliable source of electric power will exist, particularly in times of electrical emergency.

When two or more electric generators are electrically connected with each other, the laws of science require each generator to spin at exactly the same speed or frequency. Generators so connected are said to be operating in synchronism or in parallel with each other. This is true no matter who owns the generators and whether the generators are located adjacent to each other or are physically separated by several hundred miles. An important characteristic of electricity is man cannot force electricity to follow any specific path without disconnecting all undesired paths from the generator; thus, when interconnections are closed, electrical disturbances in one generator or transmission line instantaneously impact upon all interconnected generators. Also, the only effective assurance that power will not flow across Texas state lines, if Texas companies wish to preserve their intrastate status, is to either have no interconnections with any utilities that operate in interstate electrical transmissions (which would include severing ties with Texas electric utilities that transmit or receive power across state lines) or make sure that any points of interconnection between intrastate Texas electric utilities and interstate electric utilities remain open, preventing power flow between the two systems.

Various types of electric energy exchanges may be agreed to by interconnected utilities. These exchanges include:

(1) "Ecomomy Energy": Electric energy which one utility sells to another utility at a cost less than the receiving utility can generate its own electricity;

(2) "Emergency Energy": Electric energy which one utility receives from another when the receiving utility is unable to provide its own system needs due to an unforeseeable failure of equipment, or "outage" on its system; and

(3) *"Wheeled Energy"*: Electric energy which one utility transmits to another utility (or to itself) over the transmission lines of a third, intermediate utility which charges a fee for such services.

## INTERCONNECTIONS BETWEEN THE PARTIES

Interconnections between electric utilities in Texas began as early as 1924 with interconnections between TESCO and WTU. These two companies, along with TPL and DPL, later formed the North Texas Interconnected System (NTIS).

An emergency interconnection between HLP and Gulf States Utilities (GSU) was first made in 1928 (the Huffman tie), but this interconnection did not operate closed as a matter of normal operation until World War II, at which time HLP began operating continuously interconnected with CPL, LCRA, City of Austin and the CPSB to help alleviate capacity shortages brought on by the war. This action lead to the formation of the South Texas Interconnected System (STIS). While defendants were indirectly interconnected with each other in the 1940's, there was little, if any, coordination between the systems and STIS and NTIS until the 1960's. On or about August 26, 1935, solely because of the passage of the Federal Power Act, and solely to avoid becoming subject to FPC jurisdiction, WTU opened its interconnections with PSO. Both TESCO and WTU then believed that operation in interstate commerce in a manner which would subject them to the consequences of FPC jurisdiction was not in the best interest of their customers. There is no evidence in the record to suggest that TESCO and HLP reached any agreement or were even interconnected in 1935, or that DPL, TPL and TESCO reached any agreement when TESCO made its determination to avoid interstate commerce. TESCO's determination in 1935 was its unilateral effort to serve its customers in the most advantageous manner.

Interconnections were reestablished between TESCO and WTU pursuant to a written agreement which, as amended from time to time, was continued in effect until cancelled on May 11, 1976. This agreement required both WTU and TESCO to give prior notice in the event either wished to commence operation in interstate commerce so as to permit the other to choose the type of operation in which it desired to engage that is, in intrastate or interstate commerce.

In 1962, HLP and TPL built a direct tie to connect their systems as the next major step in the evolution toward interdependence and cooperation. Soon thereafter, NTIS and STIS were joined into the Texas Interconnected Systems (TIS) in 1967. At the time TIS was formed, all of its members operated and wished to continue operating on an intrastate basis (see appendix E).

In 1970 ERCOT was formed, consisting of the members of TIS as well as various municipalities and rural electric cooperatives; although the names "ERCOT" and "TIS" are sometimes used interchangeably, the two groups do have functional differences. TIS consists of only the bulk power systems whereas ERCOT includes all of the members of TIS and small municipal and REA cooperatives. ERCOT reports to NERC, while TIS coordinates bulk power systems. Membership in ERCOT is available to any electric utility which owns, controls or operates an electric power system in Texas, and ERCOT promotes reliable operations of power systems in Texas by providing a means to communicate and coordinate the planning and operation of its members.

TIS is operationally coordinated with all of the generators in TIS operating in synchronism with each other so that if there is a loss of any individual generator, all of the other generators in TIS respond automatically to compensate for the loss. Historically, all members of TIS and ERCOT, while maintaining interconnections among themselves, have not, except in times of emergency, maintained interconnections with electric utilities operating outside of the State of Texas.

The maintenance of interconnections among WTU, CPL, TESCO and HLP and

other systems in Texas was mutually beneficial and permitted the interconnected parties to reduce the total amount of installed reserves and to exchange electric power in times of sudden emergencies. These interconnections also assured a greater degree of electric reliability for all participating companies. The interconnecting electric systems comprising TIS and ERCOT are large enough to take advantage of all economies of scale and at the same time not too large to be unmanageable. The larger an interconnected system becomes, the greater the opportunity for cascading blackout and other operating difficulties.

The interconnection agreements between WTU and TESCO preserved the right of system self-determination, that is, the right to decide whether to operate in interstate commerce subject to the consequences of FPC jurisdiction or to operate in intrastate commerce subject only to state and local regulatory authority. The interconnection agreement between WTU and TESCO did not require either party to continue to operate in intrastate commerce, to maintain interconnections with each other or any TIS or ERCOT member and was cancellable at any time by either party for any reason without penalty. It also did not restrict either WTU or TESCO from providing electric service anywhere.

It has been the common understanding among the members of TIS and ERCOT that each individual system member believed it to be in the best interest of its customers to operate solely in Texas. It was also commonly understood among the members of TIS and ERCOT that if a system chose to engage in interstate commerce, it would give prior notice to all other members in order to permit each other system the right to choose whether to operate solely in Texas or to operate in interstate commerce as it determined was in the best interest of the customers. The coordination in TIS and ERCOT has resulted in perhaps the most reliable and lowest cost electric power in the nation. The president of plaintiff company CPL, R. W. Hardy, believes ERCOT and TIS have been and are models of efficiency and reliability.

## INTRASTATE OPERATION

Since August 31, 1935, when Title 2 of the Federal Power Act became effective, any electric utility which owns or operates facilities used for the transmission of electric energy in interstate commerce has been subject to the regulatory powers of the Federal Power Commission (FPC), now the Federal Energy Regulatory Commission (FERC) (as used hereinafter FPC shall include FERC), set forth in Title 2 of the Federal Power Act, 16 U.S.C. §§ 824 to 828C. Generally these regulatory powers include the power to order an electric utility to interconnect with another electric utility under certain circumstances (16 U.S.C. § 824a), the power to oversee the disposition of certain utility assets (16 U.S.C. § 824b), the power to regulate the issuance of an electric utility securities (16 U.S.C. § 824c), and the power to regulate rates for the transmission and sale of electric energy at wholesale in interstate commerce (16 U.S.C. § 824d).

The record indicates that the defendants began consulting with each other regarding their intrastate operations in the 1960's. These consultations were necessitated by a variety of factors. First, HLP and TESCO's affiliate TPL built a direct interconnection in 1962. Second, the standards of jurisdiction under the Federal Power Act changed drastically during the 1960's so that defendants became concerned with jurisdiction even though they had no facilities crossing state lines. Third, these concerns were confirmed when the FPC advised the defendants in the 1960's that they were in fact subject to the FPC jurisdiction under the Federal Power Act. The FPC's effort to assert jurisdiction was followed by its continuing effort through the early 1970's to promote the interconnection of TIS with the South West Power Pool (SWPP), which is the group of utilities operating to the north and east of TIS.

The only means to ensure freedom from federal regulation and the adverse electrical, economic, operational and administra-

tive consequences flowing therefrom is not to operate interconnected with any facility used for the transmission or sale of electricity in interstate commerce. As a result of the events listed above HLP and TESCO have, from time to time, consulted with each other to determine whether there were points of interconnection which presented the potential for the interstate flow of electricity. Defendants were particularly concerned for many years with the points of interconnection between WTU and its affiliate PSO because of the very peculiar nature of the interconnection. Mr. Hardy, the current chief executive officer of CPL and previously the president of WTU, testified that these interconnections were designed to give CSW the ability to transfer power between its subsidiaries in order to qualify under an exemption under the Public Utility Holding Company Act. Defendants had in fact expressed concern over these interconnections through the years but were reassured by CSW that it desired to operate its two Texas subsidiaries on an intrastate basis and that the operational split of its subsidiaries presented no threat to its holding company status.

There were installed over the years at strategic locations between the northern and southern divisions of WTU various devices to prevent interstate flow of electricity under circumstances which would render TESCO jurisdictional and to protect against synchronous operation of TESCO with WTU's northern division, PSO and other members of SWPP. There was never any dispute between WTU and TESCO as to the object of avoiding synchronous operation. Some disputes did develop with respect to the use of interlocks as opposed to power flow relays in order to make certain that the FPC could not order synchronous interconnections of TESCO with SWPP, but these differences were always resolved to the mutual satisfaction of the parties.

In order to insure the validity of the securities issued by TESCO and others, the interlock devices which were owned by TESCO were inspected and tested periodically through the years. These inspections and tests did not interfere with the opera-

tions of WTU even though the testing of the interlock device did result in an annual flicker of certain loads on WTU's northern division. It would take the annual testing of the interlocks for 240 years for any loads on WTU's northern division, however, to be interrupted for a total of one minute.

It has been the common understanding and agreement among all the electric utilities and TIS that if one of the members of the TIS decided to commence interstate operations, it would provide prior notice to the other members so that each could independently decide whether to exercise its unilateral right to disconnect and remain in an intrastate mode. This understanding was, for example, reflected in the WTU–TESCO contract which was subject to immediate cancellation by telephonic notice. Plaintiff gave no notice prior to their commencement of interstate operation on May 4, 1976, because they feared defendants would exercise their right to disconnect.

Each defendant has indicated that it will engage in an interstate mode of operation when there is shown to be advantages to the customers of the defendants that outweigh the advantages of the present intrastate system of operation. There is considerable evidence of each defendant's past and present efforts to evaluate the benefits and costs of an interstate mode of operation. In fact, one of plaintiffs' own witnesses, Mr. Arey, was retained by TESCO and its affiliates in 1966 to study interconnection with SWPP, and he concluded that TESCO and all the other members of TIS would be better off operating on an intrastate basis. In contrast to plaintiffs' assertion that the defendants have acted unreasonably in operating intrastate, Mr. Arey testified that it would not have been unreasonable for defendants to continue intrastate operations based on the results of his study.

The wisdom of TESCO's determination to avoid synchronous interstate operations is illustrated repeatedly by the failure of all attempts by the Texas companies to operate in synchronism with the vast electrical sys-

tem outside Texas. Synchronous operation of the Texas utilities and interstate utilities during 1942 to 1945 resulted in numerous system outages both in Texas and in other states. Some of these outages occurred because of trouble as far away as Alabama, Tennessee and Mississippi. Synchronous operations of the Texas utilities in interstate commerce during 1942 to 1945 were unsatisfactory and were tolerated only because of the emergencies of World War II.

In 1957, HLP and GSU tested whether their systems could operate in synchronism. The resulting electrical disturbances were so severe that the test had to be abandoned. In 1968, the FPC encouraged HLP, TPL and GSU to test synchronous operations through the GSU–HLP Huffman tie. The 1968 test also proved totally unacceptable and was abandoned.

From August 28, 1976, to January 22, 1977, plaintiffs attempted to operate in synchronism with the SWPP. Such operations resulted in serious reliability problems and at least nine system separations, two of which occurred because of generation difficulties in Mexico. Moreover, CSW has publicly acknowledged in a prospectus filed with the SEC that the TIS, including WTU and CPL, cannot operate in synchronism with PSO and SWEPCO and other members of SWPP without critical operating problems.

TESCO and HLP have stated that while they believe that intrastate operation is in their best interest and in the best interest of their customers, if it appeared advantageous to commence synchronous operation with SWPP, they would be among the first to undertake that mode of operation. Until such time as there is advantage to their customers from interstate operation, defendants prefer to avoid the cost of regulation which would inevitably result from interstate operation. This preference can hardly be regarded as unreasonable since defendants obviously received no benefits from any such regulation. Indeed, plaintiffs' economic expert admitted that it was in defendants' own best interest to avoid FERC regulations.

*Events Leading to Filing of Plaintiffs' Complaint*

Both plaintiffs, WTU and CPL, told the Department of Justice in 1973 that they did not want to interconnect with SWPP because the interconnection would degrade the reliability of TIS. Moreover, plaintiffs have admitted that intrastate operation was in their best interest until 1974. Plaintiffs' change in attitude in 1974 coincides with the date of the filing of the complaint against plaintiffs' parent holding company, CSW, in the Securities and Exchange Commission (SEC).

Five months after WTU and CPL advised the Department of Justice that they did not wish to interconnect with PSO and other members of SWPP and after advising the Department of Justice of their continued desire to limit their business to the State of Texas and intrastate commerce, a complaint was filed with the SEC alleging that CSW was not a single integrated electric utility system within the meaning of the 1935 Act. In response to this petition, CSW hired Power Technologies, Inc. (PTI) to perform a study concerning alternate modes of integrating the holding company. In the summer of 1974, Mr. S. B. Phillips, Jr., chairman of the board of CSW, invited TU to participate in the study. Mr. Phillips informed TU that the study would include modes of operation which integrated the CSW companies with synchronous operation with the SWPP. At such meeting the chief executive officer of CSW told the chief executive officer of TU that if he did not cooperate in proceeding with synchronous operation between ERCOT and SWPP, CSW would force such mode of operation upon ERCOT companies, including TESCO and HLP, against their will.

TU declined to participate in the study commissioned by CSW because the CSW study was limited to examining how best to integrate the CSW companies for the purpose of complying with the 1935 Act and would not include examination of whether ERCOT should be connected with SWPP.

The preliminary results of the PTI study were presented to the CSW board of directors at a meeting on October 16, 1975. At that meeting, CSW, on the advice of its counsel, adopted a policy to integrate its affairs by causing its four subsidiaries to operate in synchronism while at the same time maintaining all interconnections with non-affiliated companies, including TESCO and HLP. At the time such decision was made by CSW, no reliability studies had been conducted, the economic study was not complete and no effort was made to evaluate the impact of synchronous operation on other companies in SWPP or TIS/ERCOT.

Following completion of the PTI report, it was personally delivered by CSW to TU. Again, CSW advised TU that TU would either cooperate in the implementation of synchronous operation with SWPP, or it would be forced upon TU against its will. At no time did WTU or CPL or their parent, CSW, approach TESCO or HLP on the basis of conducting studies to determine the best mode of operation for electric utility systems in Texas or elsewhere but on the contrary, continuously insisted that synchronous operation would be instituted whether it was in their best interest or not.

In late December, 1975, CSW's chairman of the board delivered a copy of the PTI report to the president of HLP, inviting HLP's cooperation in the implementation by CSW of a Mode 4 operation, but stated that CSW was committed to an interstate mode of operation and CSW would force HLP's cooperation if HLP's cooperation was not voluntarily forthcoming.

On December 31, 1975, CSW filed the PTI report with the SEC and advised the SEC that it was committed to proceeding with the integration of its four subsidiaries by sewing together the electric systems comprising ERCOT and SWPP. CSW advised the SEC that Mode 4, the preferred mode of operation, would permit the CSW companies to utilize the transmission system of other member companies of ERCOT, which, in turn, would integrate the four CSW companies in a manner required by the 1935 Act. CSW further advised the SEC on December 31, 1975, that if defendants did not cooperate in such an interconnection, other options for securing the necessary cooperation would be considered. This representation was consistent with the other threats made by CSW against the defendants prior to such stay. Prior to December 31, 1975, the plaintiffs never advocated nor did they desire to operate in interstate commerce in synchronism with SWPP. Prior to the attack on CSW's holding company status, neither WTU nor CPL attempted to or desired to undertake synchronous operations with PSO or other members of the SWPP.

For 40 years prior to December 31, 1975, WTU, CPL and CSW believed that the nature of their operations, including the maintenance by WTU of its northern division electrically isolated from the southern division, was in their best interest and in the best interest of their customers. On January 30, 1976, the SEC ordered that an evidentiary hearing be held to consider, among other things, whether the electric utility facilities of the subsidiaries of CSW were capable of being economically operated as a single integrated and coordinated system within the meaning of the 1935 Act. TU and HLP intervened in the SEC proceeding announced by the January 30, 1976 notice, and a pretrial hearing was scheduled for May 12, 1976.

TESCO advised the SEC that the mode of operation proposed by CSW would radically alter the mode of operation of TU and the other members of TIS and would pose a threat to reliability of service and would impose unreasonable and uneconomic burdens upon TU and TIS customers and investors. Such a change in mode of operation would result in an unjustifiable risk to such customers and investors. TESCO further advised the SEC that it appeared that CSW's proposal was being made merely as a scheme by CSW to save its holding company.

CSW embarked on a secret and clandestine maneuver on May 4, 1976 to save its holding company status by utilizing the facilities of the defendants against their will.

At a secret meeting of CSW executives and attorneys in the latter part of April, 1976, CSW's vice president and chief engineer memorialized a legal plan to save CSW's holding company and confirmed the lack of any other motivation for the action subsequently taken on May 4, 1976.

In the darkness of night on May 4, 1976, WTU performed a midnight wiring of electrical circuits charged with 69,000 volts of electricity between WTU and PSO, a procedure which placed WTU, and therefore all members of TIS and ERCOT, in interstate commerce. At trial WTU attempted to justify the establishment of this new radial line as part of its plan to implement Mode 4 operation. In fact, plaintiffs' own witnesses testified that the existence of this radial line was not in any way contemplated nor a necessary part of any plan to implement Mode 4 and although some of plaintiffs' witnesses stated that the radial line was necessary in order to ensure reliable electric service to the communities in Oklahoma, I find that the evidence is to the contrary and that the midnight wiring was done without any legitimate business purpose. By installing the radial line, often referred to as the "midnight wiring", WTU maliciously and willfully violated its long standing agreement with TESCO by failing to notify TESCO of the commencement of interstate operation and for the purpose of requiring TESCO and HLP to operate in synchronism with SWPP. This is also evidenced by the fact that this suit was filed on May 3, 1976, along with an application for a temporary restraining order, in an attempt to force the defendants into interstate operations without the defendants' voluntary consent.

At the time of the midnight wiring, defendants had evaluated the PTI report. Upon being notified of the midnight wiring TESCO concluded independently that it was done in furtherance of a plan to force the synchronous interconnection of ERCOT and SWPP against their will and in furtherance of the threats earlier made. TESCO had concluded that the implementation of Mode 4 would downgrade its reliability and would cost a significant amount of money with no corresponding benefits to it or to its customers. Based upon TESCO's prior evaluation of the mode of operation which was in its best interest and the best interest of its customers, the threats made, the purpose of the PTI study and its knowledge with respect to the adverse effects of interconnected operation gained over a long period of time, it had no reasonable alternative other than to disconnect from the plaintiff and from other electric utilities if it was going to be in a position of exercising its own choice as to the best mode of operation in the future. HLP had also reached the same conclusion, although independent of TESCO. Both defendants had to act quickly after the midnight wiring of May 4, 1976 occurred if they were to preserve their intrastate mode of operation. The longer the defendants remained interconnected with WTU, with the plaintiffs and other utilities which were connected in interstate commerce, the more likely it would be that the FPC would assert jurisdiction over the companies.

In severing connections with plaintiffs on May 4, 1976, defendants acted independently and defensively in pursuing the only action that would allow them to preserve their ability to decide for themselves the manner in which they would conduct their operations. The purpose of the actions of WTU and PSO on May 4, 1976 was to force TESCO and HLP into interstate commerce and subject TESCO and HLP to federal regulation against their will. The motive behind the actions of WTU and PSO on May 4, 1976 was to preserve CSW's corporate structure and CSW's status as a regulated holding company under the 1935 Act. Any economic benefit realized by WTU as a result of the establishment of the radial feed into Oklahoma on May 4, 1976 was minimal at best, and was not a justification in itself for establishing the radial tie.

## THE COURT'S DECISION

The Court has spent the last eight weeks reviewing both the record in this case, which is over 3,500 pages of testimony and about 1,000 exhibits, the court's notes and

recollections and the law that applies to this case, and I think I have a pretty fair understanding of what this case is all about. Plaintiffs have advanced a number of theories of recovery, and there is a lot of evidence, so from that standpoint it is a complicated case; but I think many of the key questions in this case are simply questions of law.

■ This case, as it has been presented over the past two and one-half years, really boils down to a single, preliminary question of law, that is, whether or not it is a violation of § 1 of the Sherman Act for an electric utility to exercise the freedom of choice provided by Congress in § 201(b) of the Federal Power Act [16 U.S.C. § 824(b)] and decide to confine its facilities and operations solely within a single state. Plaintiffs have made much of the argument that this is a group boycott, that they are not talking about just one electric utility deciding to operate in intrastate commerce, but a group of utilities, and the defendants' concerted action means that interstate utilities cannot connect to them, specifically that the plaintiffs cannot connect to the defendants and remain in interstate commerce.

In this context I do not perceive a difference between one utility deciding to operate intrastate, or a group of utilities, independently or even in concert, deciding to operate intrastate. Congress must have been aware of the unique characteristics of the electric utility industry at the time it adopted the Federal Power Act and must have been aware that the operation of a totally intrastate electric utility system could have potential antitrust considerations. Congress gave the electric utilities a choice: intrastate operation or interstate operation. If taking advantage of the intrastate option violates the Sherman Act, then the provision of the Federal Power Act becomes meaningless. Congress can rewrite the Federal Power Act and eliminate that provision; I cannot. Therefore, I do not think that the actions of the defendants violate the Sherman Act, § 1.

■ I want to emphasize one factor which I took into account in evaluating the credibility of the witnesses, which I must do in this case as the trier of fact. I mentioned that this case turns primarily on questions of law, but I certainly recognize that there are significant factual issues in this case, particularly the testimony concerning the alleged economic savings and increased reliability to CSW if Mode 4 is implemented. I think it is a fair statement of the law that when a court considers an antitrust case, the focus of the court's inquiries should be upon the actions of the defendants, not the plaintiffs. Stated another way, for purposes of determining whether or not the defendants have violated the Sherman Act, the motive of the plaintiffs in bringing the suit is irrelevant to a determination of the plaintiffs' claim.

■ There has been a lot of testimony in this case concerning CSW and the plaintiffs' bad motives in bringing this case, and I think that I should make clear that I have not considered that testimony in making my determination on the merits. On the other hand, I do think that that testimony can be relevant to my evaluation of the credibility of the witnesses, particularly when that testimony is essential to plaintiffs' factual support for the Sherman Act claims, such as the testimony regarding competition and the alleged savings to the plaintiffs from Mode 4 operation. In the same regard, I think I must carefully consider testimony that was given in documents that were prepared after the SEC challenged CSW's holding company status and after the May 4, 1976 wiring into Oklahoma. Certainly the plaintiffs' alleged motive in bringing this case merely to integrate CSW's holding company and avoid divestiture is not conclusive in my evaluation of the credibility of certain witnesses, but I think that the defendants have amply demonstrated in this record, as I have found earlier in this opinion, that the plaintiffs had this motive available to them, and used it, other than the motives plaintiffs have advanced, for filing this lawsuit, and, more particularly, for developing testimony that would support the alleged Sherman Act violations.

*Group Boycotts*

█ Concerted refusals to deal, or "group boycotts", are per se illegal under the Sherman Antitrust Law. *Fashion Originators Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The principle of the group boycott cases is that where businessmen concert their actions to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct, because exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free market principles embodied in the Sherman Act that we will not consider any alleged justification. *United States v. General Motors,* 384 U.S. 127, 146, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

█ "Group boycotts . . . have not been saved by allegations that they were reasonable in the specific circumstances, nor by failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality' ". *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) *(quoting from, Fashion Originators,* 312 U.S. at 466–468, 61 S.Ct. 703). It is of no consequence under the Sherman Act that each party acted in its own lawful interest and it is unnecessary to find an explicit agreement to find the Sherman Act conspiracy. *United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

█ It is the intent to eliminate competition that determines the illegality of a joint refusal to deal. The court must examine the purpose and intent of the alleged conspirators, not to determine whether or not the defendants engaged in a refusal to deal to achieve purported beneficial results brought about through the elimination of competition, but rather to discover whether or not the purpose and intent was anticompetitive.

For example, in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) the court stated, quoting from *United States v. Socony Vacuum Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129:

> "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price[s] of a commodity in interstate or foreign commerce is illegal per se";

and in *Eastern States Retail Lumber Dealers Association v. United States,* 234 U.S. 600, 606, 34 S.Ct. 951, 952, 58 L.Ed. 1490 (1914) the Court stated:

> ". . . it appears that the defendant associations have for their object, among other things, the adoption of ways and means to protect such trade and to prevent the wholesale dealers from intruding therein."

█ Other group boycott cases also indicate that the Court must consider whether or not the alleged group boycott had the requisite anticompetitive purpose. *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (holding that a bylaw was "plainly designed in the interest of preventing competition"); *Radiant Burners Inc. v. Peoples Gas, Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Binderup v. Pathe Exchange,* 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923) ("[t]he alleged purpose and direct effect of the combination and conspiracy [were] to put an end to these contracts . . . and 'restricts . . . the liberty of a trader to engage in business.' " at 312, 44 S.Ct. at 101). The plaintiffs need not show specific intent on the part of the defendants to restrain trade; in an antitrust case, it is unlikely that there will be an express agreement in violation of the antitrust laws, and therefore circumstantial evidence assumes a heightened importance that may sustain a finding of a conspiracy. *Coughlin v. Capitol Cement Co.,* 571 F.2d 290 (5th Cir. 1978); *In re Yarn Processing Patent Validity Litigation,* 541 F.2d 1127 (5th Cir. 1976).

The Fifth Circuit has recognized three types of group boycotts that are per se violations of the antitrust laws; (1) horizontal combinations among traders at one level of distribution, whose purpose is to exclude direct competitors from the market (e.g., *Eastern States Retail Lumber*); (2) vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination (e.g., *Klors v. Broadway-Hale Stores, Inc.*); and (3) combinations designed to influence coercively the trade practices of boycott victims rather than to eliminate them as competitors (e.g., *Fashion Originators*). *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manufacturing Co.*, 467 F.2d 178 (5th Cir. 1972). "In all of these cases, the touchstone of per se illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade' and have fallen victim to the per se rule. On the other hand, where these elements have been missing, the per se rule has not been applied to collective refusals to deal. *Id.* at 186–7. Where exclusionary or coercive conduct is not present, the court should apply the rule of reason test to determine whether there is a violation of the Sherman Act. *Hatley v. American Quarter Horse Association*, 552 F.2d 646 (5th Cir. 1977).

I must exercise extreme caution in applying a per se label to conduct that allegedly violates the antitrust laws. "To outlaw certain types of business conduct merely by attaching the 'group boycott' and 'per se' labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed". *Worthem Bank & Trust v. National Bank Americard, Inc.*, 485 F.2d 119, 125 (8th Cir. 1973). While it is true that the Supreme Court has outlawed group boycotts as per se illegal, "a multitude of lower courts have continued to evaluate alleged boycotts under a 'rule of reason' analysis rather than by the per se doctrine employed by the Supreme Court in the aforementioned cases. As one commentator has observed, 'the law in Washington, however, is quite different from the law in the rest of the country.', Woolley, *Is A Boycott A Per Se Violation of the Antitrust Laws*, 27 Rutgers L.R. 773 (1974)", *Cullum Electric & Mechanical Inc. v. Mechanical Contractors Association of South Carolina*, 436 F.Supp. 418, 428 (D.C.S.C.1976), and the Fifth Circuit closely scrutinizes group boycott allegations. *See E. A. McQuade Tours, Inc. v. Consolidated Air Tour Mfg. Co.*, 467 F.2d 178 (5th Cir. 1972); *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835 (5th Cir. 1975); *Hatley v. American Quarter Horse Association*, 552 F.2d 646 (5th Cir. 1977); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir. 1978); *Pinder v. Hudgins Fish Co., Inc.*, 570 F.2d 1209 (5th Cir. 1978).

As I read them, then, there are three types of group boycott cases recognized by the Fifth Circuit, and a requirement that the alleged boycott have an anticompetitive purpose, with exclusionary or coercive conduct; I don't think this case fits any of those descriptions.

First, there has been ample testimony in the record (for instance, the testimony of Hardy and Price) that there is no direct competition between CPL and either HLP or TESCO, and no direct competition between TESCO and HLP with WTU, except de minimis competition in certain areas duly certified to TESCO and WTU. So this case does not fit within the first two *McQuade* categories of group boycotts that involve direct competition.

Second, the key to the third category of group boycott cases cited in *McQuade* was the "coercion practiced indirectly on a rival method of competition . . . ." 467 F.2d at 187. In *Fashion Originators*, cited by *McQuade* as an example of this third category, a group of garment manufacturers refused to sell original designs to stores that stocked copies of those designs made by other manufacturers, and thus there was a conspiracy to eliminate the copiers from the market. Here, except in certain multiply certified areas I mentioned earlier, there is no direct competition between

plaintiffs and defendants. Defendants can't conspire to deprive plaintiffs of a market they do not share and, under the Public Utility Commission of Texas' (PUC's) certification procedure, they cannot share since utilities are certified for only certain areas. I will discuss this competitive aspect of the case in more detail later in this opinion.

Third, I must examine the purpose of the alleged boycott. HLP and TESCO's purpose in remaining in intrastate commerce was to avoid FPC jurisdiction. The second purpose was to serve the best interests of their customers by providing reliable, economical power. On this record after hearing all the testimony, I do not find that the purpose was in any way anticompetitive or coercive because plaintiffs do not meet their burden of showing any anticompetitive or coercive intent.

If I am to find a Sherman Act violation in this case, I must also find a contract, combination, agreement or conspiracy in restraint of trade. As I understand the pleadings and the evidence, the plaintiffs are claiming that over a period of some 40 plus years, at least since the adoption of the Federal Power Act in 1935, the defendants have been engaged in a combination and conspiracy, the essence of which is recorded in certain contracts between the defendants, to restrict the flow of power in the defendant companies to intrastate commerce.

 To analyze this allegation properly, it is important to understand that unilateral refusals to deal, without more and "[i]n the absence of any purpose to create or maintain a monopoly", are lawful under the Sherman Act. *United States v. Colgate*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 997, (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). A manufacturer has a right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself, and "(i)nherent in this right is the opportunity to show unilateral as opposed to conspiratorial conduct at trial." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 301 (5th Cir. 1978).

 I recognize, as did the Fifth Circuit in *Coughlin*, that the so-called Colgate Doctrine has been carefully circumscribed by the Supreme Court. 571 F.2d at 301 n.22. The doctrine does not apply to a case where there is an agreement between the seller and a purchaser to maintain resale prices, *United States v. Bausch & Lome Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), and *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and a producer secures adherence to prices by means which go beyond his mere declination to sell to a customer who will not observe this announced policy. *See Parke, Davis & Co. and Federal Trade Commission v. Beech-Nut Parking Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307. "However, the post-Colgate decisions of the Supreme Court do not in any way limit a manufacturer's right to attempt to disprove the existence of concerted action." *Coughlin,* 571 F.2d at·301, n.22.

I do not think that the plaintiffs have proved concerted action in this case. They have established that both HLP and TESCO want to remain in intrastate commerce and that they both wish to do so to avoid FPC regulations. Plaintiffs also established that TESCO and HLP took measures, such as flying the Red River (as Mr. Robinson testified), or checking the power flow relays and points of interconnection, to protect against inadvertent interstate flows of electricity. I think the evidence, however, shows that each of the companies, including the plaintiff companies, who, interestingly enough, did not object to this intrastate arrangement and apparently wanted to participate in that type of operation until around 1974-75, decided that for one reason or another, the intrastate method of operation which would avoid FPC jurisdiction was the method of operation that each wanted to pursue. Plaintiff companies apparently did this because they saw high immediate costs of interconnecting interstate rather than remaining intrastate (see Px 19) although plaintiffs apparently made no long· range study, as they now have, to determine the long range economic costs

and savings of interstate vs. intrastate operations.

The evidence also shows that each of the companies, including plaintiffs and defendants, have always had the opportunity for withdrawing from the intrastate method of operation in connecting interstate. None had elected to do so until May 4, 1976 (except in the war years, and other unusual situations), and there was ample evidence that the only objection defendants had to plaintiffs' withdrawal from intrastate operations and connection to interstate operation on May 4, was that the defendants were not permitted to make their own independent decision about whether or not to join the plaintiffs in that decision; the decision was forced upon them. For a period of time on that day defendants were involuntarily drawn into interstate operation because of the midnight wiring.

I think one of the most damaging pieces of evidence to plaintiffs' conspiracy theory is the fact that when, on May 4, the defendants were involuntarily placed in interstate commerce, they each disconnected from all other utilities, not just WTU and CPL, in order to isolate their systems because they were not sure whether or not these other utilities, who had not participated in the midnight wiring, would remain in interstate commerce. If there was an agreement, combination or conspiracy by defendants among themselves to remain in intrastate commerce, it certainly would not have been necessary to disconnect from everyone and isolate their systems. TESCO clearly did not know whether HLP would remain in interstate commerce; and HLP did not know whether TESCO would remain in interstate commerce either. Even though up to May 4, 1976, each defendant thought the other defendant was committed to intrastate operation, there was clearly not a firm understanding or a joint conspiracy to that effect or the disconnections would have been unnecessary, as between the defendants.

A lot of contracts have been introduced in this case, and the plaintiffs claim that these contracts evidence the agreement by the defendants to remain in intrastate commerce. Some of the contracts have clear indications of intention that the parties will remain in intrastate commerce; others have clauses which indicate that the contracts are cancellable on certain notice if the parties wish to enter interstate commerce. The plaintiffs were parties to some of these contracts and never complained about them, perceiving them to be in their own best interest for nearly forty years before suddenly objecting to their character.

Justice Brandeis once observed that all contracts were really restraints of trade and thus violated the Sherman Act, if the Act were carried to illogical extremes. These contracts do restrict the flow of electricity to intrastate commerce, but I do not find that they force the plaintiffs to remain in intrastate commerce. Plaintiffs have the choice of abiding by the contracts and remaining in intrastate commerce, or deciding to go into interstate commerce and cancelling the contracts. I think it is significant that different contracts were negotiated between the different parties with different provisions relating to the intrastate flow of electricity over the years.

Here I think is a situation that is covered by the Supreme Court's ruling in *Colgate*: None of the defendants are doing anything more, and have done nothing more, than decline to sell to any utility, not just plaintiffs, who are engaged in interstate electrical operations, or to connect with that type of utility. No one has forced the plaintiffs to remain in intrastate commerce; they are free to leave that mode of operation whenever they choose to do so. And each of the defendants is free to do so, also. The contracts do not limit that freedom; they merely make clear to the parties to the contract that the exchange of electricity provided for in the contract is premised on the intrastate character of that electricity. The contract provisions only preserve each party's right to operate on an intrastate basis. See 16 U.S.C. § 824(b). An effort to avoid FPC regulation is "not unlawful, is indeed not immoral—not even if it fails." *Hartford Electric Light Co. v. FPC*, 131

F.2d 953, 960 (2d Cir. 1942). *See also Connecticut Light & Power Co. v. FPC*, 324 U.S. 515, 518–19, 65 S.Ct. 749, 89 L.Ed. 1150 (1925), and on remand, *Connecticut Power & Light Co.*, 6 F.P.C. 104, 110 (1947).

*Competition*

▮ The Sherman Act requires that the Court find, when evaluating this case under the rule of reason, anticompetitive effect, and when looking at this case as a group boycott or one of the other per se theories, I must look to see if there was an anticompetitive purpose. In addition, the Court must look at the competitive impact of the alleged Sherman Act violations to determine the scope of the requested injunctive relief. *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

To determine an agreement or act's anticompetitive purpose or its impact on competitive conditions, the court must have a thorough understanding of the competition between plaintiffs and defendants, including the geographic and product market in which they compete. *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978); *Dougherty v. Continental Oil Co.*, 579 F.2d 954 (5th Cir. 1978). Although decided in a slightly different context, the cases decided under § 7 of the Clayton Act are helpful in identifying the types of competitive interests which are protected by the antitrust laws.

In *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) the Supreme Court affirmed the District Court's decision that the economic reality of the coal industry at the critical time was such that United Electric Coal Co. was not in a position to compete with anyone because its reserves were limited and were also totally committed to long term contracts with utilities. In addition, in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) the Supreme Court held that NBC (a Seattle bank) was not a competitor of WTB (a Spokane bank) because NBC did not market goods and services in the Spo-

kane bank's area of operation. The Court held that the "relevant geographical market" was the area in which the relevant product was, in fact, marketed by the alleged competitor.

"The proper question to be asked . . is not [whether] the parties . . . do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. (citations omitted) This depends upon 'the geographic structure of [the] supplier-customer relations' . . . ." *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Where two department stores sold entirely different types of merchandise and only 2%–5% of the merchandise was sold by those stores, the two stores were not competitors, and to hold that they were "competitors" would be to ignore the realities of the situation. *Evans v. S. S. Kresge Co.*, 544 F.2d 1184 (3rd Cir. 1976).

▮ The definition of market under § 1 of the Sherman Act is different from the definition under § 2. *Columbia Metal etc. v. Kaiser Aluminum & Chemical Co.*, 579 F.2d 20 (3rd Cir. 1978). "The § 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopolization. § 1, in contrast, is concerned with patterns of competition as a means of judging whether a restraint of trade is unreasonable". *Id.* at 27 n.11. "Prohibition of conspiracies in restraint of trade, except where practices fall under a judicially crafted per se ban, a finding of illegality presupposes the determination in any given case that the 'effect upon competition in the marketplace is substantially adverse.'" *Id.* at 26. The inquiry must focus on the percentage of business controlled, the strength of the remaining competition, and whether the actions spring from business requirements or purpose to monopolize. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277, 1294 (1953); *Columbia.* In drawing the narrow circle around the relevant product market,

care must be taken to exclude any product to which, within reasonable variation and price, only a limited number of buyers will turn. *Id.* Analysis of the market may reveal well defined sub-markets for antitrust purposes whose boundaries can be determined by examining industry or public recognition, or the sub-market as a separate economic entity, the products' peculiar characteristics or uses, unique production facilities, distinct customers, distinct prices, sensitivity of price changes, and specialized vendors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510, 535–36 (1962).

I can find no evidence of competition between plaintiffs and defendants for purposes of the Sherman Act. First, there is no direct competition between the plaintiffs and defendants except in the limited dual certification areas or fringe areas of WTU and TESCO, which is only determined competition. The Texas Legislature expressly recognized the absence of meaningful competition among electric utilities by stating: ". . . the legislature finds that public utilities are by definition monopolies in the areas they serve; that therefore the normal forces of competition which operate to regulate prices in a free enterprise society do not operate; and therefore utility rates, operations, and services are regulated by public agencies, with the objective that such regulation shall operate as a substitute for such competition . . ." Tex.Rev.Civ.Stat.Ann. Art. 1446(c).

Electric utilities in Texas are required to serve all customers in their certified service territory. They are permitted to operate only within and are prohibited from serving beyond the geographic limits of their service territory as approved by the PUC. They are also required to sell electricity at rates established either by the PUC or by an incorporated municipality, and are prohibited from offering a special rate to customers.

Plaintiffs have admitted to the U. S. Department of Justice, which was then conducting an antitrust review in connection with licensing of the construction of nuclear powered generation plants, that there exists no competition between plaintiffs and defendants and that the defendants' maintenance of their intrastate status did not injure plaintiffs' ability to compete with others. Retail competition exists only among utilities within dually certified areas, and HLP has no dually certified areas with WTU or CPL. TESCO has no dually certified areas with CPL and the areas which are dually certified between WTU and TESCO are so insignificant that the revenue to TESCO in 1977 from customers located in those areas constituted less than one-half of 1% of its total revenues. Consequently, actual and potential direct competition among WTU and TESCO is de minimis. In addition, there exists no consequential competition in the fringe areas between the service areas of plaintiffs and defendants. These areas are sparsely populated, with no consequential economic growth and no economic incentive for WTU or TESCO to engage in competition in these areas. Plaintiffs rely primarily on examples of indirect competition, therefore, to establish that defendants and plaintiffs really compete.

As I understand the evidence, the areas of indirect competition supposedly include: (1) competition between the plaintiffs and other electric utilities, not necessarily the defendants, in areas that are multiply certified by the PUC in certain fringe areas located between the two utilities; (2) competition between plaintiffs and other utilities including defendants to attract new customers (including industrial, commercial and residential, though primarily industrial) to locate in their service territory; (3) competition to retain current customers by providing low cost reliable electric service that outperforms alternative methods available to the industrial, commercial or residential user; and (4) competition for wholesale customers.

Some of plaintiffs' witnesses said that two utilities are in competition when one utility takes some action that will affect, in some way, the price charged by the other

utility for its electric power. Thus, the defendants alleged refusal to operate electrically interstate has an effect on plaintiffs' prices, as evidenced allegedly from plaintiffs' economic testimony, and therefore plaintiffs are in competition with the defendants. The theory is that if defendants' actions raise (or restrict the lowering of) plaintiffs' price it charges its customers for electricity, then plaintiffs will be unable to compete effectively for new industrial customers, existing customers, or wholesale customers of plaintiffs' power since those customers may be lost to cheaper forms of electricity or other forms of power. Competition to the plaintiffs means a choice (see Mr. Price's testimony). Plaintiffs are in competition with all of those choices, and if the defendants affect that choice in any manner that affects plaintiffs' price of electricity, plaintiffs and defendants are in competition.

I will confine my remarks here to a discussion of plaintiffs' witnesses on competition; my views on how defendants' affect the price of plaintiffs' electricity are discussed later. First, though, I should point out that if plaintiffs' view of competition is correct, then every Sherman Act case is really a price fixing case. If we accept plaintiffs' view of competition, then every purchaser has an ultimate choice of whether to buy a particular product, and every manufacturer in some way (significant or insignificant) affects the price of every commodity, thus there are no geographic limitations (and probably few product limitations) to the competitive market in an antitrust case. Dr. Wenders admitted that the geographic extent of the market for new industrial customers could be nation-wide or even world-wide. This is an incredibly broad market, and plaintiffs made absolutely no effort to measure the impact on competition which would occur in this market as a result of defendants' alleged antitrust violations. The case law also does not support such a broad reading of the term market in a Section 1 case, or for that matter, in a Section 2 case either.

Dr. Wenders' definition of competition in an economic sense, as I understand it, was that if a customer had a reasonable alternative choice (and he never did adequately define exactly what he meant by reasonable alternative choice) to buying electric power from the defendants, then there was competition with the defendants. The same would be true with the plaintiffs. Thus, for example, when an industrial customer considered locating in the HLP service territory and other territories around the country, including CPL, HLP would be competing with those territories including CPL even though HLP did not seek the customer, did not want the business, did not know it was being considered by the customer as a possible location, did not know about the alternative choices being considered and electricity rates and reliability were not of any consequence in a customer's decision to locate in one service territory or another. Dr. Wenders also testified that as to product market, all types of fuel were reasonable alternatives or could be reasonable alternatives to electricity, and were thus in competition with electricity, including batteries, wood, gas, windmills and solar power. Under the Sherman Antitrust Law, I cannot accept these definitions of competition either. They are far too broad, and in fact, I am not aware of any court that has accepted these broad definitions of either product or geographic market. If I were to accept these definitions, I would, it seems to me, be virtually eliminating the concepts of geographic and product market from consideration in an antitrust case.

■ Dr. Wenders testified about a coordinated services market which, on cross examination, he admitted was not really a market where competition occurred, but rather an area of cooperation. The competition occurred at markets, in his words, "downstream", of this coordinated services market, but the allegations in this antitrust case, he admitted, relate to an alleged violation of Section 1 that resulted in failure of the defendants to *cooperate* in this so-called coordinated services market which then had an indirect effect on the downstream markets.

I am not sure if plaintiffs are really advancing Dr. Wenders' theory or not; one of the problems I have had with this case has been that just when I understand all of the theories plaintiffs are advancing in their claim under Section 1, their theory of the case shifts to accommodate a change in case law or arguments by the defendants. Assuming Dr. Wenders is correct in his analysis of plaintiffs' case, however, it is certainly not a violation of § 1 of the Sherman Act to refuse to cooperate in an area where there is currently no competition between the parties. It would rewrite the antitrust laws, which the plaintiffs seemed to be suggesting should be done in a number of areas, for this court to say that it was a violation of § 1 for the defendants *to refuse to cooperate* with the plaintiffs.

Plaintiffs failed to establish the size, scope or geographic limits to the downstream markets. Furthermore, plaintiffs did not show any threatened harm to competition in these markets. Specifically, there is no proof that even if plaintiffs' rates increased, they would lose business or be unable to attract new business because of some unidentified increase in their rates attributable to the inability to operate in Mode 4.

A review of the evidence demonstrates that plaintiffs failed to prove substantial effect on competition in any of the downstream markets. To begin with, plaintiffs assert that there is competition for franchises to serve retail load in the cities and towns within Texas. There is no evidence that HLP has ever lost a franchise or that another utility has ever been franchised in a town in which HLP had a franchise. No HLP franchise will expire before the year 2007 and no CPL franchises will expire for many years. There was no evidence that plaintiffs and defendants have ever competed for franchises and no evidence that they will in the future. Dr. Wenders admitted that defendants would have no economic incentive to disadvantage plaintiffs in regard to franchise competition. Finally, plaintiffs made no effort to measure the amount of competition involved with franchises.

Plaintiffs also contend that they will be disadvantaged in interfuel competition. The interfuel market, as described by Dr. Wenders, includes virtually every conceivable energy source which could serve as a substitute for electric energy. As I have stated, this is an extremely large market, and plaintiffs made no attempt to measure the amount of competition in this market. Likewise, plaintiffs made absolutely no effort to measure the impact on competition within this market as of the time of defendants' disconnections on May 4, 1976. Finally, plaintiffs' economic expert admitted that the defendants would have no economic incentive to try to affect such competition.

Plaintiff next advanced a competitive theory of self-generation with respect to the choice that their customers have to generate their own supplies of electricity. Dr. Wenders admitted that the feasibility of self-generation of electricity usually depends upon the availability of waste steam. With respect to its customers who have waste steam available, however, HLP encourages self-generation. As with interfuel competition, plaintiffs made no effort to define the size, scope or geographic limit of this market. Moreover, plaintiffs totally failed to demonstrate how decisions by their customers to commence self-generation would have any effect on competition among the electric utilities, including plaintiffs and defendants.

Again, with respect to wholesale competition, plaintiffs failed to define the size, scope and geographical limits of such market. Dr. Wenders even volunteered that while he thought wholesale competition related primarily to TIS, the geographic extent of this market was limited only by the distance at which electricity could be transferred economically. Plaintiffs made no effort to establish this distance, and again it must be presumed that this market would be extremely broad since plaintiffs are themselves planning to transmit power to their affiliated companies in Oklahoma, Arkansas and Louisiana under CSW's interconnection proposals. There was no at-

tempt by plaintiffs to show that competition in the wholesale market would be restrained by plaintiffs' inability to implement Mode 4. More specifically, there was no showing that even if plaintiffs' rates were increased, they would lose existing wholesale customers or would be disadvantaged in competing for new wholesale loads. At most, plaintiffs showed that there were a few situations in which wholesale customers in Texas switched suppliers for reasons that may or may not have been related to differences in electric rates, but there was no evidence of competition between plaintiffs and defendants for wholesale customers. Mr. Jordan, president of HLP, testified that HLP had only one wholesale customer and that HLP did not want any more wholesale customers.

With respect to retail customers, direct competition among electric utilities in Texas is possible only in areas where the PUC has certified two or more utilities to provide service. There is affirmative evidence that there is no dual certification of territories served by plaintiffs and defendant HLP. The amount of load served by TESCO in areas dually certified with WTU amount to approximately one-half of 1% of TESCO's total load. Accordingly, the potential for retail competition among the parties is so minimal as to be virtually non-existent.

Plaintiffs have attempted to bolster their theory of retail competition with assertions that the parties compete for the location of new industrial customers in their service areas. While there appears to be evidence that all the parties have made efforts to attract new industrial customers in the past, the changing economic conditions for electric utilities in Texas during the 1970's, including rising costs and fuel shortages, have reduced, if not eliminated the incentives these utilities might have in seeking to obtain industrial or wholesale customers. HLP had abolished its area development department by 1973.

There was ample testimony that although there had been industrial company inquiries to the plaintiffs concerning electric rates in their area, electricity is not really a significant factor, except perhaps in one or two industries that are not well represented in Texas, in a decision to locate a plant in one location or another. Corporations deciding on the location of new industrial plants normally consider a wide range of factors, including availability of raw materials, location of markets, transportation costs and taxes. Compared with other factors, the cost and availability of electricity have had little or no significance in influencing corporate decisions concerning locations of industrial plants in Texas. Plaintiffs in fact failed to show a single instance where a decision to locate a new plant was based primarily on electric rates. Added to this is the fact that plaintiffs did not cite a single situation in which both plaintiffs and defendants were actively attempting to induce the same industrial customer to locate in their respective service areas.

Plaintiffs' Exhibit 733, which represents dually certified areas in the WTU system, shows very few towns that are dually certified with very small populations. Finally, and these are just a few examples of many instances that I can cite, WTU told the Justice Department (TESCO 296, DHX 68 and DHX 156) that TESCO and WTU did not compete, at a time that the Justice Department was investigating to determine whether or not possible antitrust violations had occurred in the Commanche Peak project; CPL made the same admission. (DHX 199, DHX 200). Apparently WTU's and CPL's definition of competition, for antitrust purposes, has changed since the time of that response.

I also did not find Dr. Wenders to be a very credible or qualified witness, and I will outline in brief some of the reasons I reached that judgment. Dr. Wenders based his testimony on the record in this case and on the depositions on file in this case, as well as his own investigation. Dr. Wenders unqualifiedly relied on the depositions on file in this case, and subsequently qualified that statement in a very significant respect, when on cross examination he said he did not agree with everything Dr. Gols had said, including a definition of competition

offered by Dr. Gols that differed from Dr. Wender's definition. And, although he said he based his testimony on the actual transcript of this case, it appears that Dr. Wenders had read selected portions of the transcript, and in some instances had only read the direct examination of some witnesses, excluding the cross examination. His outside preparation to determine the proper market analysis also appeared to me to be rather selective. In short, Dr. Wenders impressed me as an expert who selected material favorable to an analysis of this case that favored the theories advanced by the plaintiffs, ignored the evidence or theories produced by the defendants and chose not to make a complete review of the record or evidence available, leading me to view his conclusions with grave suspicion.

█ I think, from the record, and considering what I have said so far, that if any product and geographic market has been shown, the correct product market should be limited to electricity and the relevant geographic market should be limited to the physical service areas of the plaintiffs and defendants because that is where the direct competition, if there is any, and I think there either is none or de minimis competition, occurs. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

Aside from plaintiffs' failure to show any meaningful or significant competition among electric utilities in Texas, they totally failed to prove that defendants were motivated to any degree whatsoever by any anticompetitive intent in their decisions to disconnect from plaintiffs on May 4, 1976. In fact, plaintiffs did not show that defendants even considered possible effects on competition prior to the disconnections on May 4, 1976. Defendants' representatives testified that they decided to disconnect because interconnection with the Southwest Power Pool, which could result from a failure to sever connections with plaintiffs, would produce a heavy economic burden for their customers without offsetting advantages, would degrade the reliability of their electric systems and would impose addition-

al costs associated with federal regulation. Plaintiffs presented no evidence to the contrary and do not even assert that defendants had an anticompetitive purpose in deciding to disconnect and preserve their right to decide for themselves whether to commence interstate operations.

Plaintiffs' theory of the competitive impact resulting from defendants' disconnections on May 4, 1976 proceeds indirectly through several steps. First, plaintiffs contend that the disconnections precluded them from implementing Mode 4 which would reduce their costs and revenue requirements. Second, higher costs and revenue requirements would presumably cause plaintiffs to have higher rates. Third, assuming plaintiffs had higher rates, they would theoretically be hampered in their ability to compete in various "downstream" retail and wholesale markets for electric service. Contrary to this multi-faceted theory, plaintiffs' company witnesses admitted that they had no knowledge of any lost customers or other competitive disadvantages suffered by plaintiffs as a result of defendants' disconnections. Moreover, plaintiffs' economic expert, Dr. Wenders, admitted that if plaintiffs could obtain greater economic benefits from intrastate operation as opposed to interconnection with the other CSW subsidiaries in interstate commerce, plaintiffs' whole theory of competitive impact would fail. On this record I think plaintiffs are better off remaining in intrastate commerce or Mode 2 interstate commerce, when compared to Mode 4. Finally, despite all of his testimony concerning theories of competition and competitive impact, Dr. Wenders had "no idea" whether it was reasonable or unreasonable for defendants to disconnect from plaintiffs under the circumstances of May 4, 1976. In Dr. Wenders' words "May 4th, to me, is a matter of sideshow."

*Price Fixing*

█ An agreement that interferes with the setting of price by free market forces is illegal on its face. *United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct.

510, 21 L.Ed.2d 526 (1969). The per se rule applies even when the restraint on prices is somewhat indirect. *Simpson v. Union Oil Co.*, 377 U.S. 13, 16–22, 84 S.Ct. 1051, 1054–57, 12 L.Ed.2d 98, 101–105 (1964); *United States v. General Motors Corp.*, 384 U.S. 127, 147, 86 S.Ct. 1321, 1331–32, 16 L.Ed.2d 415, 427–28 (1966). The court must examine the purpose of any alleged agreement to fix prices, however, just as it examines the purpose of any alleged group boycott. *Id.*

> "[I]f a manufacturer is unwilling to rely on individual self interest to bring about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customer's acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price maintenance combination or conspiracy in violation of the Sherman Act."

*United States v. Parke, Davis & Co.*, 362 U.S. 29, 46–47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505, 517 (1960).

> "[A] combination formed for the purpose . . . of raising, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 233, 60 S.Ct. 811, 844, 84 L.Ed. 1129, 1168 (1940).

■■■■■ There are a number of examples of typical price fixing cases, such as the exchange of price fixing information with an agreement to adhere to a price schedule, *Sugar Institute v. United States*, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936), *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1421 (1940); agreements to eliminate sales of a product by competitors in order to protect against real or apparent price competition, *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); and refusal to deal with wholesalers who did not cooperate with the company's goal of obtaining adherence to suggested minimum retail prices, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). When per se treatment is inappropriate, the court should examine the allegations under the rule of reason standard. *In Re Nissan Antitrust Litigation*, 577 F.2d 910 (5th Cir. 1978). The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700, 705 (1927).

Plaintiffs have evaluated several modes of future operation of their systems. Under one mode (Mode 4), WTU and CPL will allegedly engage in completely interconnected interstate operation with PSO and SWEP, have their generating plants centrally dispatched with those of PSO and SWEP and retain their interconnections with the other TIS companies, including TESCO and HLP, placing the latter companies in interstate commerce. Under another mode (Mode 2), WTU and CPL will engage in completely interconnected centrally dispatched interstate operation with PSO and SWEP, but will not retain their interconnections with any TIS companies including TESCO and HLP and those latter companies will remain in intrastate operation. Plaintiffs also evaluated another mode of operation (Mode 1) which refers to that mode of operation in which all ERCOT member companies are interconnected, directly or indirectly, but have no direct or indirect interconnections with electric utilities operating in interstate commerce.

■■■■■ I think I have already indicated that I do not think this case falls within the traditional concept of a price fixing case. There has been no effort by the defendants to set either minimum or maximum prices, or to exchange price information or to in

any way protect prices. The only relation this case has to prices is plaintiffs' argument that because defendants' actions allegedly affect or will affect over the next 20 years the prices the plaintiffs charge for electricity and these charges, being higher than if Mode 4 were implemented, will affect plaintiffs' competition in the electric industry with the defendants. I have already rejected that broad theory of price fixing as transforming all antitrust cases into price fixing cases, and I find no interference in this case by the defendants with the free market forces at work in the business world. "A manufacturer's refusal to deal with a distributor or dealer does not violate the antitrust laws merely because it adversely affects the entity refused." *Marquis v. Chrysler Corp.*, 577 F.2d 624, 640 (9th Cir. 1978). These effects are immaterial if the refusal is for business reasons which are sufficient to the manufacturer as long as there is no arrangement restraining trade. *Id.; Joseph & Sons, Inc. v. Hawaiian Inc. Oaks and Liquors Ltd.*, 416 F.2d 71 (9th Cir. 1969).

Plaintiffs' evidence concerning the defendants' effect on plaintiffs' prices of electricity due to the refusal to interconnect into interstate commerce and integrate the CSW system is not persuasive to me. The existence of a threatened injury to the plaintiff companies is also a requirement for the extreme injunctive relief sought by the plaintiffs. *Zenith.*

Plaintiffs' first evidence of the injury to the plaintiffs by this alleged violation of § 1 was a study conducted by Power Technologies, Inc. "This particular study was triggered by specific questions raised before the Securities & Exchange Commission involving C&SW's present operating pattern. The possibility of changing this pattern raises the broad question of the possibility of altering the basic operating pattern of the entire region to one where all utilities in ERCOT and SWPP are interconnected. This study does not attempt to examine and answer directly this broader question but instead evaluates the three alternative possibilities in terms of the potential economic impact on each of the customers of C&SW." (Page vii–viii PTI study, Px 671). Thus the study was commissioned not because plaintiffs had long desired to enter interstate commerce nor because they felt defendants were boycotting them, but rather it was done in response to the SEC proceedings in which a group of utilities challenged CSW's holding company status. This, in my mind, throws into serious doubt the credibility of the studies that were conducted by CSW, some of which were going on and were completed only after the beginning of this trial. The PTI study had a definite purpose in mind: to examine the cost of integrating the CSW system and it did not consider the impact on ERCOT in terms of cost or alleged savings, and in fact did not break out the savings for the plaintiffs in this case.

The PTI study did not undertake to evaluate the best mode of operation for WTU and CPL nor the best mode of operation for PSO and SWEPCO nor the best mode of operation for utilities operating in the State of Texas or in SWPP. I am not able to place much faith in such a dictated study, and the other studies introduced into evidence by the plaintiff following the PTI study are also, I believe, tainted with the same questionable motive. I discussed earlier plaintiffs' motive which I have taken into account, so I will not expand on this point any further.

I will note a few things about this study and the other studies. For example, in the PTI report Dr. Wood relied on CSW's operating committee to get his information on fuel availability for power plants put in the generation plant, and the CSW planning subcommittee for load forecast and fuel cost. These two factors were very important in the study, but rather than making an independent analysis (or being permitted to make that analysis) he principally relied on CSW for the information. In Mode 1, Plan One, which I recognize has supposedly been abandoned by the plaintiffs now, its base case application in comparison to Mode 4, Plan 11 was seriously hampered by the fact that Mode 1, Plan One contained a

large number of very small generating units as compared with the preferred plan. While Mode 4 was developed by PTI, the economic results were compared to Mode 1, which was developed by CSW personnel.

No plans were drawn by Plaintiffs which "optimized" (to use the term of the witnesses) ERCOT with centralized dispatch for comparative purposes, although that could have easily been done. The PTI report did not include costs for wheeling, line losses or off-system economy sales (except those PSO had under contract), even though PSO has historically engaged in massive off-system opportunity sales. None of the defendants were ever offered by the plaintiffs any compensation for the cost of installation of Mode 4. The PTI transmission system was a broad brush treatment and no reliability study was conducted. "It is planned to conduct a reliability study in order to consider the interrelation of interconnection capability, generating unit size and type with the reserve requirements necessary to hold a given, objective standard of service reliability calculated using probability methods." (PTI at 8).

The economic benefits shown on the study supporting the plan submitted to the SEC are clearly speculative in nature and provide no basis for a finding of competitive injury:

(a) There are no savings to CSW from Mode 4 until 1986;

(b) 50% of the savings come in the last three years of the 20 year study and there is no provision for sites or fuel for any of the plants planned for any of those three years;

(c) After 1986, 12 of the 22 new power plants to be built by CSW are lignite-fuel plants for which CSW has no assured supply of fuel;

(d) 90% of the alleged savings come from differences in fuel costs. The fuel costs used in these studies are very speculative, and in fact, certain of the fuel cost assumptions changed drastically in the short time between preparation of the PTI report and the SEC study;

(e) If Mode 4 is not implemented by 1982, the studies would have to be reevaluated and there are numerous regulatory hurdles that CSW must clear before it can begin implementation of Mode 4.

Dr. Wood admitted that his cost calculations should but did not, include costs that would be imposed on defendants and other members of TIS as a result of the proposed power transfers between CSW subsidiaries. The omission of these records has been justified by CSW's position that the interconnection between CPL and SWEPCO would serve as a "contract path" (a term that no expert in the electric utilities industry had heard before it was proposed as a conceptual idea by the plaintiffs in this and related litigation), the cost of which would supposedly approximate the cost of wheeling power through TIS. Plaintiffs' transmission design expert, Mr. Arey, admitted that notwithstanding the existence of this "contract path" up to 70% of the CSW transfers would still go over the transmission lines of defendants and other members of TIS. The evidence shows that the "contract path" was not in any way designed to compensate defendants. In his deposition, Mr. Arey admitted that he was told to include the direct tie between CPL and SWEPCO in his transmission design because of CSW's legal problems at the SEC. Mr. Arey also admitted that CSW would be using the TIS transmission system and that the ability to use the TIS system represented the difference in cost to CSW between Mode 4 and Mode 2. Nonetheless, plaintiffs have never offered to pay defendants for either the use of their systems or the cost imposed on them, but have in fact insisted that defendants should bear part of the costs of the interconnections.

Dr. Wood admitted that either Mode 2 or Mode 4 would achieve integration of CSW and that Mode 4 would save only 1.1% to 1.6% more than Mode 2 for all four subsidiaries combined, over a 20 year period. This difference is without the penalty which should be charged against Mode 4 for wheeling and internal costs that would be imposed on the non-CSW members of TIS.

Dr. Wood also admitted that he was not able to make any allocation of the Mode 4 savings among the four CSW subsidiaries. He further admitted that the actual allocation of savings would ultimately depend on the outcome of regulatory hearings in the States of Texas, Oklahoma, Arkansas and Louisiana.

And yet, this is the study, with all of its weaknesses (including the fact that the PTI study became outmoded to some extent with the inclusion in the study of generation based primarily on coal resources which had not been contracted for), that the CSW Board used to base its decision to enter interstate operations and upon which it based its conclusion that an antitrust case should be filed in this court because plaintiffs were being boycotted by defendants, and this would have a terrible impact upon the price of plaintiffs' electricity in the future.

I recognize, as I think counsel for plaintiffs pointed out during the testimony, that just because the initial figures were wrong and that new, more accurate figures are provided, that that fact alone does not negate the existence of an antitrust violation. But in this case I think it clearly goes to the credibility of the plaintiffs' case—an apparently hasty decision was made on incomplete data, which included some broad brush studies of transmission, and no reliability studies. If plaintiffs were seriously concerned about procuring the alleged savings and pursuing the most economical mode for CSW, their actions would seem, at best, hasty, and the fact that those decisions were hasty and were apparently primarily motivated by the SEC proceedings and preservation of the holding company, rather than by concern over antitrust violations, makes me seriously question the correctness of the PTI study and all studies thereafter as they relate to this litigation. That skepticism is heightened by my recollection of the testimony, and review of it over the past few weeks, because serious holes and erroneous assumptions were built into the various studies and restudies of the economics of the situation.

Another of plaintiffs' witnesses, Mr. Bruggeman, attempted to update Dr. Wood's work in studies completed after the trial of this lawsuit had begun. These CSW plans, proposed without Dr. Wood's assistance, projected for a twenty year period, with losses for the first ten years of the study. There was no evidence that CSW had any fuel resources for generators for the second ten years of the study period, and there was no competent evidence upon which Mr. Bruggeman could rely in projecting the fuel cost for plants during the second half of the study period. Coal contracts had not been secured, lignite leases not developed nor plant locations determined.

These studies, based almost entirely on hearsay, were not even admitted in evidence for the truth of the information they contain. Nevertheless, in reliance on its studies, Mr. Bruggeman sought to make an arbitrary allocation of the savings to show the possibility that plaintiffs would share in them, even though he was not qualified as an expert on allocation of savings within a power pool. That allocation depends on future decisions by regulatory authorities, so there is no basis for determination on this record that plaintiffs will share in any portion of the savings attributable to Mode 4. Any savings projected without any competent evidence with respect to cost are purely conjectural and speculative.

CSW has apparently decided to implement the generation plans proposed by Mr. Bruggeman's study, [R. 2332–33 (Bruggeman)], and has apparently abandoned the PTI and other generation plans. [R. 2404 (Bruggeman)]. Mr. Bruggeman assembled new generation plans which were completed after two weeks of trial. I might add, in passing, that I had no real idea, most of the time, what Mr. Bruggeman was talking about, and after rereading his testimony, I still find it very confusing and not any more enlightening. I think the plaintiffs had a duty to present the evidence to the court in a comprehensible form—I don't know too many judges that are electrical engineers or system planners, and when it

came to Mr. Bruggeman, the plaintiffs failed in that respect.

I found Mr. Scarth's testimony the most enlightening of all, and, despite plaintiffs' cross examination, I believe his exhibits and testimony about Bruggeman's figures showing alleged savings to CSW, and not Bruggeman's testimony, at least what I understood Bruggeman to say.

The Bruggeman studies which were completed after this trial began were illogical and biased in favor of Mode 4 as compared with Mode 1B:

(a) Bruggeman's Mode 1B generation plan assumes three more expensive 400 megawatt coal units at Lake Diversion and two less expensive 640 megawatt coal units at Lake Diversion in Mode Four. The same assumption in both modes reduces the alleged savings of Mode 4 over Mode 1B;

(b) Bruggeman's studies do not include off-system opportunity sales even though PSO has historically had extensive off-system opportunity sales. Off-system sales reduces the alleged savings of Mode 4 over Mode 1B;

(c) Bruggeman's studies do not include any charge for wheeling even though such costs will be required for the massive amounts of power proposed to move over transmission lines of the TU companies and other non-CSW companies. The inclusion for wheeling costs reduces the alleged savings of Mode 4 over Mode 1B;

(d) Bruggeman's studies do not include a charge for line losses or other essential transmission lines for non-CSW companies. The inclusion of costs for line losses and minimum additional transmission lines just for the TU system reduces the savings of Mode 4 over Mode 1B.

Even using the same assumptions and date, Mode 1B results in a savings not a loss as compared to Mode 4 if only these reasonable changes and costs are included.

The conclusions and opinions of Mr. Bruggeman were based upon fuel costs and other estimates which are not in evidence and upon which there was no evidentiary predicate laid. Mr. Bruggeman was not qualified to opine as a fuel expert. Consequently, those conclusions were admitted into evidence only for the fact that he made such conclusions and not to the truth thereof.

The opinions of Dr. Wenders concerning the nature and extent of competition among electric utilities in Texas is based entirely upon the conclusions of Mr. Bruggeman [see R. 2702 (Wenders)] and upon the realization of net savings in a Mode 4 configuration. Since Mr. Bruggeman's conclusions have not been established by competent evidence for the truth thereof, the opinions of Dr. Wenders do not support their conclusions. Indeed, the implementation of Mode 4 is likely to result in substantial net cost rather than any savings.

Cascading blackouts can and do occur on electric systems at a time when the systems on "paper" appear reliable. The northeast blackout is an example of this. Electric systems in Texas form a peninsula and are capable of being interconnected with just one other Reliability Council. Human error impacts the reliability of an electric system, and the larger the interconnected system becomes, the more complicated communication among system members and the chance for human error creating a cascading type blackout is greater. From the testimony, the plaintiffs have not established that the interconnection of TIS/ERCOT with SWPP would be as reliable as the current intrastate operation, or even a reliable network.

■ Even assuming that plaintiffs had proved a violation of the antitrust laws by defendants, there is no evidence that they are threatened with harm as a result of such violation. Plaintiffs' parent holding company has not yet obtained approval from the SEC which would result in a synchronous, interstate mode of operation for the four CSW subsidiaries. In addition, plaintiffs have not even submitted plans for interstate operations to the Texas PUC for approval. Under the latest Mode 4 plans presented by CSW at the SEC, no savings would be realized by plaintiffs until at least

1986, and under the evidence in the record, savings that far in the future are speculative at best. Apart from Mode 4, plaintiffs have the option of interconnecting with SWPP in a Mode 2 configuration which defendants do not oppose. Under these circumstances, plaintiffs have failed to prove threatened loss or damage sufficient to support their claim for permanent and injunctive relief.

To summarize, "[r]ecovery and damages under the antitrust law is (sic) available to those who have been *directly* injured by the lessening of competition and is withheld from those who seek the windfall of treble damages because of incidental harm." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 at 271 (5th Cir. 1978), (emphasis added) (Robinson-Patman Act case). Here there is only an incidental, if any, effect on prices, and plaintiffs are not entitled to a windfall of injunctive relief because of incidental harm.

### Vertical and Horizontal Restraints

When this case was originally filed in 1976, certain territorial restrictions were per se illegal under the Sherman Act. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). "Under the Sherman Act it is unreasonable without more for a manufacturer to restrict and confine areas [for] persons with whom an article may be traded after the manufacturer has parted with dominion over it." *id.* at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260, but when a "manufacturer retains title, dominion and risk with respect to the product and the position and function of the dealer in question are, in fact indistinguishable from those of an agent or salesman of the manufacturer" then the rule of reason governs. *Id.* at 380, 87 S.Ct. at 1866. The per se rule applied in *Schwinn* to territorial restriction was overruled in *Continental TV Inc. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), although the Court left the door slightly ajar for applying per se illegality to particular applications of vertical restrictions if they were based upon demonstrable eco-

nomic effect, rather than Schwinn's formalistic line drawing. *Id.* at 58, 97 S.Ct. 2549, 53 L.Ed.2d at 585.

"[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

*Northern Pacific Railway v. U. S.*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958). Horizontal markets divisions, as opposed to the vertical restrictions discussed in *Schwinn* and *Continental* are per se illegal under the Sherman Act. *Timken Roller Bearing Co. v. U. S.*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Dougherty v. Continental Oil Co.*, 579 F.2d 954 (5th Cir. 1978), and entities in a seemingly vertical relationship may be deemed capable of horizontal restraints if they are actual or potential competitors. *Id.*

Horizontal agreements are those in which the participants in the normal course of things will be competing among themselves. *Arnold, Schwinn & Co.*, 388 U.S. at 372, 87 S.Ct. at 1862, 18 L.Ed.2d at 1256. As stated in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), it is a per se violation of § 1 of the Sherman Act when there is an agreement between competitors of the same level of the market structure to allocate territories in order to minimize competition, or, a horizontal restraint.

Again, I must consider whether or not plaintiffs and defendants are competitors, and I reach the same conclusion: for purposes of § 1, and horizontal restraints, they are not, and therefore the per se approach should not apply, but rather the rule of reason analysis. In addition, I cannot see any way that the plaintiffs can argue that the defendants have allocated territories in order to minimize competition. The PUC in Texas allocates geographic territories for the electrical market in Texas, and while defendants have some influence in the PUC as do the plaintiffs, they have no

open control over those decisions. For these reasons also, I do not see how this is a horizontal restraint case.

Plaintiffs have cited a recent Fifth Circuit case involving electric utilities as authority for per se treatment, *Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292 (5th Cir. 1978). In *Gainesville*, unlike the factual circumstances in this case, the plaintiffs were able to show opportunities for one utility to "invade" the service territory of another utility, a history of consultation between two neighboring utilities and the allocation of new wholesale customers between utilities as requests for service arose. In *Gainesville* there was an agreement to allocate customers which was obviously anticompetitive in effect and intent; *no similar agreement exists in this case.*

██ If this is a vertical restraint case, and I am not sure that it is, [the Fifth Circuit has found it difficult on occasions, (see *Dougherty*) to determine which pigeonhole the facts in this case belong] it would be governed by the rule of reason.

*Rule of Reason*

Justice Brandeis articulated the basis for the so-called "rule of reason" test in the Sherman Act cases in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918). "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress [and] even destroy competition. To determine the question the court must originally consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because

knowledge of the intent may help the court to interpret facts and to [prevent] consequences."

██ The rule of reason does not permit the court to consider any argument in favor of a challenged restraint that could be labeled reasonable; rather the court must focus on the challenged restraints impact on competitive conditions. *National Society of Professional Engineers v. U. S.*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The test prescribed by the Supreme Court in *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910) is that the challenged contracts or acts may be unreasonable if that determination is based either on the nature or the character of the contracts or the surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. *National Society.* Again, the intent or purpose of the contract must be considered when the court decides whether or not a Sherman Act violation has occurred. *Standard Oil*, 221 U.S. at 58, 31 S.Ct. 502, 55 L.Ed. at 644; *Chicago Board*, 246 U.S. at 238, 38 S.Ct. 242, 62 L.Ed. at 687; *National Society.* The key inquiry, however, is whether or not the challenged agreement (if one is found) merely regulates and promotes competition or suppresses it. *National Society, supra.* Absent anticompetitive effect, an unlawful intent will not establish a rule of reason violation, nor will the use of unfair methods of competition. *H&B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239 (5th Cir. 1978).

As of May 4, 1976, defendants had been advised that CSW was going to integrate its four subsidiaries to avoid legal problems at the SEC. CSW had clearly threatened to take action against defendants to force them to participate in CSW's scheme to integrate its system. When defendants learned of the radial tie into Oklahoma, and the legal actions associated therewith, it is clear they had to either disconnect or surrender to CSW's plan of coercion.

Defendants have established a long history of examination of the question of the

benefits of interconnection with SWPP, and they have always concluded that they were better off operating in their intrastate mode. Defendants concluded early in 1976 that the PTI report provided absolutely no basis for a change in their view. The PTI report, which was the only study given defendants before May 4, 1976, does not even address the benefits or costs for non-CSW systems resulting from the proposed interconnection. Accordingly, as of May 4, 1976, defendants had no basis upon which to change their prior convictions that interconnection with SWPP would degrade their reliability and would impose substantial costs upon their customers with no resultant benefits.

As of the time of this trial, defendants have exhibited willingness to continue their past history of examining the costs and benefits associated with interstate connection with SWPP. Defendants have shown a reasonable belief that interconnection with SWPP would not be economical and would degrade their reliability. Plaintiffs have presented no evidence showing that defendants would benefit from the interconnection, other than some rank speculation by Mr. Arey about the ability to sell some power to SWPP. Mr. Arey conceded, however, that it is not the normal industry practice to build interconnections to make such opportunity sales. There is absolutely no evidence suggesting that the companies in SWPP would desire interconnection or would desire to purchase any such power. The only other potential benefit from interconnection, a reduction in reserve capacity, would not be economically practical according to Dr. Wood.

Plaintiffs themselves conceded that TIS is one of the most reliable interconnected systems in the United States. In addition, plaintiffs' expert, Mr. Arey, admitted that TIS was a reliable system and that there was no need for interconnection with SWPP from a reliability standpoint. Defendants have shown that TIS has an outstanding record of success in responding to emergencies, and they believe that their method of operation accounts for the high reliability of TIS. Interconnection with

SWPP would necessarily alter this method of operation and thus lead to degradation in reliability.

Defendants also believe that interconnection with SWPP would greatly complicate management and communication problems within the interconnected group. Mr. Arey admitted that the most recent blackout of New York City was attributable in part to such communication problems. None of the voluminous reliability studies conducted by plaintiffs addressed these concerns voiced by the defendants.

As of May 4, 1976, defendants had reason to believe that interconnection with SWPP would degrade their reliability and increase their cost of operation with no significant offsetting benefits. Plaintiffs had presented them with absolutely no evidence to the contrary as of that date. Notwithstanding this fact, HLP was still evaluating the question of whether it would participate in an interconnection with TIS and SWPP. Thus, when HLP learned of the midnight wiring, it elected to disconnect in order to preserve for itself the right to make unilateral decisions as to the desirability of such interconnections. Both defendants were concerned that the FPC might take steps to order the interconnection of TIS and SWPP over the objection of defendants in light of the long history of efforts by the FPC to bring about such an interconnection despite the opposition of defendants and the other members of TIS. Defendants believe they are pursuing the best course of action for their customers and had no anticompetitive intent or purpose in disconnecting from plaintiffs. I also believe from the testimony presented at the trial that defendants are pursuing the best course of action for their customers.

There is absolutely no evidence of any prior agreement by defendants to disconnect from any member of TIS which commenced interstate operations. Mr. Jordan, president and chief executive officer of HLP, testified that as of May 4, 1976, he had never even talked with anyone from TU or its subsidiaries about the issue of

intrastate operations. In fact, if there had been a prior agreement to disconnect between defendants, there would have been no need for them to have disconnected from each other. The absence of any preexisting agreement to disconnect is further confirmed by the extended negotiations that were required before defendants restored their interconnections on May 10, 1976.

The evidence clearly establishes that at the time TIS was formed, all of its members were committed to the proposition that it was in their mutual best interest to operate on an intrastate basis. Nonetheless, if any member of TIS chose to withdraw from TIS, it was free to do so. The other members were to be given notice of such a decision and were to be given an opportunity to decide for themselves whether they would go interstate as well or remain intrastate. Given the defendants' reasonable opposition to interconnection with SWPP and threats by CSW to force both of them into such an interconnection, it is not surprising that they both elected to disconnect from plaintiffs on May 4, 1976. Defendants acted unilaterally and took the only course of action open to them if they were to avoid the adverse effects of interstate operations.

I think it is clear from the evidence that there was no anticompetitive effect by the alleged actions of the defendants and therefore no violation of § 1. In addition, again I must look to the competition between plaintiffs and defendants, and again, for the reasons stated before, I find it non-existent or de minimis.

Finally, considering the purpose of defendants to avoid FPC jurisdiction and the reason for adopting the intrastate mode to avoid FPC jurisdiction, as well as my belief that the effect of defendants' actions on the plaintiffs is highly speculative and questionable, I believe plaintiffs have failed to show a violation of § 1 of the Sherman Act under the rule of reason. For the reasons set forth above, and in the appendix, I find no violation of § 1 of the Sherman Act and I deny plaintiffs' request for injunctive relief.

*HLP's Counterclaim*

HLP, CPL, City of Austin and the City of San Antonio are all participants in the construction of a nuclear power and generation facility known as the South Texas Project. The South Texas Project (STP) involves the construction and operation of two 1250 megawatt nuclear generating stations in Matagorda County, Texas. The participants all signed a document, executed as of July 1st, 1973, known as the participation agreement, which HLP alleges that CPL breached. The estimated cost of the project exceeds one billion dollars.

HLP alleges that CPL, under pressure from CSW, breached § 8.2 of the South Texas Participation Agreement, which provides:

> "8.2. Each participant shall design, construct, own, operate and maintain the transmission facilities necessary to connect its system to the South Texas project switch yard, with the objective of permitting each participant to transmit under normal operating conditions its generation entitlement share from units of the South Texas Project to assist in a manner which will not unreasonably affect the operation of electric systems of the other participants or the interconnected system of others . . ." (HLP Ex. # 208)

CPL's participation in the May 4, 1976, interstate interconnection, plus the August 27, 1976, commencement of CPL/WTU operation in synchronism with the Southwest Power Pool allegedly created a situation in which the South Texas project could not be planned, constructed or operated as originally contemplated. If CPL establishes interstate interconnections and/or operates in synchronism with the Southwest Power Pool, HLP alleges in its complaint that it would incur enormous expense in redesigning and reconstructing its entire transmission system in order to operate in a synchronous AC mode or, by the construction of a direct current (DC) interconnect which would allow any entity operating in synchronism with the Southwest Power Pool to remove its power entitlement from the

South Texas Project by direct rather than alternating current. These costs allegedly amount to over one billion dollars and HLP asks for recovery of this sum plus entry of a permanent injunction commanding CPL, WTU and CSW to refrain from taking any action which would require any participant in the South Texas Project to transmit its power and entitlement under abnormal operating conditions in a manner which would unreasonably affect the operation of the electric systems of the various participants in the South Texas Project or the other interconnected systems of others.

At the time the STP participation agreement was signed, it was not contemplated that any participant in STP would unilaterally commence synchronous operation with systems outside of the TIS while remaining a member of TIS. In August, 1976, CPL and WTU commenced synchronous operation with SWPP, and on December 14, 1976, CSW advised the SEC that it was going to make permanent the synchronous interconnection of its four subsidiaries. Evidence presented in this record indicates that this synchronous operation created substantial operating problems for plaintiffs until it was terminated by CSW in January, 1977, following the filing of HLP's counterclaim. The evidence is undisputed that had CPL continued to operate in this manner, both CPL and HLP could not have both obtained their power from STP absent a physical separation of the two plants with the installation of DC transmission equipment, neither of which have been planned for at this time. The testimony is also undisputed that had CSW and CPL informed HLP that they wished to operate in interstate commerce when the project was originally conceived, it would have been possible to design the STP in a different manner so that CPL and HLP/TIS could both get power from STP without there being a connection between the two systems.

While plaintiffs are now constrained by the terms of the orders of the Texas Public Utility Commission, CSW is nonetheless committed to the establishment of synchronous ties between its four companies, notwithstanding the fact that CPL is still par-

ticipating in STP. This problem is compounded by the fact that CPL and WTU are refusing to make future plans on any basis other than an assumption that they will be operating on a synchronous basis with their affiliates in SWPP. CSW has demonstrated a past history of causing precipitate operating changes among its subsidiaries despite the problems created. by such changes and without any prior study of the anticipated effect.

HLP has also shown that if CSW was able to force its mode 4 plan of operation on the STP participants, and the systems with whom they are interconnected, this mode of operation will unreasonably interfere with the operation of its electric system. First, the interconnection may require an upgrading of existing transmission lines because of the additional flows that will come into HLP's system in the event of an emergency. Second, to the extent existing lines are adequate for the power flows under mode 4, the capacity of these lines will be used by CSW for their proposed transfers and as a backup in emergencies within the proposed CSW powerpool. The net effect, therefore, is to use capacity planned by HLP and other systems for their use in transmitting power from STP and other plants on their systems. Since the TIS transmission system is not presently designed to act in synchronism with SWPP, it could not have been contemplated that CPL would unilaterally bring about the kind of drastic operating changes in TIS that necessarily would follow from any form of synchronous interconnection with SWPP as long as CPL remained a member of STP. This is a clear cut example of action by one participant which would interfere with the electric systems of the other participants in the systems with which they are presently connected.

 I find that CSW and CPL's commitment to the establishment of synchronous operation between WTU, CPL, PSO and SWEP violates § 8.2 of the South Texas Participation Agreement because that commitment is an "objective" which will

"unreasonably affect the operation of electric systems of other participants", specifically HLP. While CPL/CSW's operation in synchronism will not affect the participant's ability to get electricity until the STP actually begins operation (it is still under construction), HLP need not wait for fission before seeking an injunction prohibiting violation of § 8.2. I find that under the evidence in this case plaintiff CPL's conduct threatens a violation of Section 8.2 of the STP agreement and CPL is hereby permanently enjoined from permitting power it receives from STP to enter interstate commerce as long as CPL remains a participant in the STP Agreement and as long as § 8.2 of that Agreement remains in force.

*Costs and Attorneys Fees*

While both sides have vigorously contended that they are protecting the public interest by attempting to preserve or eliminate the current intrastate electric utility system in Texas, both sides in this proceeding have ignored the impact on the public of the staggering costs and attorneys fees expended by the parties in this case and in the proceedings before the SEC, FPC, FERC, PUC, NRC, and other forums. It would be naive to assume that the companies will absorb these expenses by way of reductions of earned surplus; it is more reasonable to assume that these expenses will be passed along to the public in the rate structure.

■ I have no control over whether or not the costs and attorneys fees in this case, or any of the other proceedings involving these parties, can be passed along in the form of increased rates to the public. While the motive of CSW and the plaintiffs in bringing this antitrust action is irrelevant (except as I have otherwise noted) to a determination on the merits of plaintiffs'

antitrust claims, I think it is very relevant to the question of whether or not the public should be forced to pay increased rates to cover the expenses of this action.[3] CSW's apparent primary purpose for filing this lawsuit was to preserve its holding company status.[4] I do not feel that the public should have to pay any of the expenses incurred in the attempt to preserve CSW as a holding company. I hope that the PUC seriously considers denying the inclusion of these expenses and those incurred by the parties in the related SEC, NRC, PUC, etc. hearings, in any rate request by these companies.[5]

It is so Ordered.

## ORDER

The Plaintiffs filed a motion to amend this Court's judgment alleging that:

(1) The Court's opinion is "at war with itself" by finding that there was no "contract, combination, or conspiracy" under Section One of the Sherman Act and at the same time finding that participation in the South Texas Project (STP) was based upon the fundamental understanding that the members of the STP intended to operate on an intrastate basis; and,

(2) Findings of the Court 13–17, 19–22, and 23–24 set forth under "Conclusions of Law" in Appendix A deal with matters outside the scope of this litigation.

■ Plaintiffs misconceive this Court's opinion, and the case as presented to the Court for decision. The Court's findings with respect to an alleged Section One violation were in direct response to allegations by the plaintiffs that defendants had an illegal agreement (i.e., a group boycott) to disconnect from any member of TIS or ERCOT which commenced interstate operations. I found that the defendants' decisions to operate on an intrastate basis were

---

3. The PUC has deferred a ruling on issues similar to the issues presented in this case pending a ruling by this court on the merits of this suit. I therefore think it appropriate to comment on these attorneys fees, even though I cannot award attorneys fees, since the PUC will be relying on this court's view of the evidence.

4. This finding is limited only to this discussion concerning the propriety of passing through these legal expenses to the public in the rate structure.

5. The Defendants may have a valid argument that they should be able to pass through their costs to the public because they did not institute this litigation, and were forced to defend it.

matters of unilateral policy rather than a product of concerted action. On the other hand, the evidence also established that all of the parties in the STP joined in the project with the common intention of continuing to operate on an intrastate basis as they had operated since 1935. Each member of the participation agreement could commence interstate operations upon advance notice to the other members of STP and TIS. There was no contract, combination or conspiracy in the STP agreement which violated Section One of the Sherman Act. Plaintiffs labor under the misapprehension that if the defendants or others made an agreement, there was a Section One violation; that is not a correct interpretation of the Sherman Act.[1]

The evidence establishes that at the time the STP was conceived, every party to the agreement knew or should have known that unilateral efforts to establish synchronous ties with SWPP would result in unreasonable interference with the transmission system of the other STP participants (e.g., Tr. 589, 2925–27). CPL ignored this understanding and Section 8.2 of the Agreement, failed to give notice of its intent to enter interstate commerce, and covertly attempted to force all members of TIS and STP into synchronous interstate operation against their will. The injunctive relief provided in this Court's opinion and judgment will protect Houston Lighting & Power from further precipitous actions by CPL designed to circumvent the participation agreement or force interstate operation on Houston Lighting & Power through subterfuge rather than negotiation.

The Plaintiffs raised the Nuclear Regulatory Commission proceedings, the Atomic Energy Act, and the new Federal Energy Act by referring to them throughout these proceedings. See supplemental findings of fact proposed by Plaintiffs, at 12–13 (Nov. 22, 1978); Plaintiffs' trial brief at 10–11; Plaintiffs' closing argument, Trs. 3620, 21. Plaintiffs specifically requested findings under the Public Utility Regulatory Policies Act of 1978 in their supplemental findings of fact proposed by Plaintiffs (proposed finding 100a; filed November 22, 1978), and in a letter brief filed by the Plaintiffs on December 18, 1978. Plaintiffs attached to the latter document a copy of the pertinent portions of the Act.

 The Court must also evaluate the reasonableness of Defendants' actions under Section One of the Sherman Act. The history of the restraint, the evil believed to exist, the nature of the business, the public interest, and the reasons for adopting a particular remedy are all relevant considerations under a "rule of reason" analysis. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Plaintiffs, for example, recognized these considerations in their trial brief and in their proposed findings of fact and conclusions of law.

"Plaintiffs do agree that either defendant individually would be justified in refusing interconnection which would have an irreparable adverse affect on its system, and thereby jeopardize the safety and well being of its customers."

Plaintiffs' trial brief, September 29, 1978 at 52.

"88. Mode 4 operation will not adversely affect the operations or reliability of any electric system in Texas, and in fact may have some beneficial effects on the operations on these other systems."

Plaintiffs' proposed findings of fact and conclusions of law filed October 3, 1978. Findings 14–17 and 19–22 all relate to the Court's analysis under the "Rule of Reason", in addition to the Public Utility Regulatory Policies Act of 1978.

---

1. Even if the STP agreement had the characteristics of an agreement in violation of Section 1, plaintiffs only established de minimus competition between plaintiffs and defendants, and "defendants can't conspire to deprive plaintiffs of a market they do not share . . . and cannot share . . .". Plaintiffs' complaint also named only one of the participants in the STP, Houston Lighting and Power Co., as a defendant or alleged co-conspirator in this case. If the evidence established that the STP agreement did violate the antitrust laws, which it does not, the court could not grant the plaintiffs relief because the proper defendants would not be before this Court.

Plaintiffs also raise in this case the legality of defendants' actions in relation to the FPC, PUC, NRC and SEC proceedings. See plaintiffs' trial brief at 22–26; Trs. 2812–2822. Plaintiffs continually attacked defendants' petitions to various governmental agencies and courts. See Trs. 2813; 2822; 2824; 2846; 3467–3476; 3674. These petitions sought to persuade these bodies to retain the Texas intrastate system. Plaintiffs proposed findings which implied that the Defendants had improperly sought agency or court rulings. *Tacita quaedam habentur pro expresis.* See proposed findings of fact and conclusions of law Nos. 60, 73, 74, filed October 3, 1978; supplemental findings of fact proposed by Plaintiffs, No. 77J, filed November 22, 1978; amended findings of fact and conclusions of law proposed by Plaintiffs, Nos. *60, *90, filed November 22, 1978. Plaintiffs specifically requested that these actions by the defendants and the Texas Public Utility Commission be incorporated as a part of the facts comprising the alleged antitrust violations in this case.

"90. At a minimum, the actions of defendants and others in the order of the Texas Public Utility Commission have foreclosed an interstate market of electric energy worth billions of dollars."

Plaintiffs' proposed findings of fact and conclusions of law, filed October 3, 1978.

The Plaintiffs raised these issues, and in conclusions 23 and 24 the Court has determined that Defendants' attempts to petition various governmental bodies were genuine attempts to influence public officials, were not a sham to cover up an attempt to directly interfere with plaintiffs' business relationships, were not part of any alleged antitrust violations, and were protected by the First Amendment.

The motion of the Plaintiffs under Rules 59 and 52(b) is hereby overruled. Certified copies of the memorandum opinion filed January 30, 1979, the judgment filed February 27, 1979, and this order shall be sent to the Texas Public Utilities Commission, the Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, and the Securities & Exchange Commission where related matters are currently pending.

It is so ORDERED.

## APPENDIX A

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings of Fact*

1. This Court specifically finds that the statements at trial by executives of TU, TESCO, DPL and HLP that they have not agreed with each other to refuse interconnections which might result in FPC jurisdiction are credible in light of all the facts in the case, and are entitled to great weight.

2. The South Texas Project (STP) nuclear generating station, a project co-owned by HLP, CPL, City of Austin and City of San Antonio, was planned and is currently being constructed on the understanding between the co-owners that participation in the ownership of the project was conditioned upon each participant confining its operations (or at least the transmission of the electricity from STP) to the intrastate transmission of electricity, solely within the State of Texas.

3. None of the parties voiced objection to this procedure (see Finding of Fact # 2) at the time construction was planned or begun on the STP; if they had, the project could have been designed so that those parties wishing to remain in intrastate commerce could do so and still get their power from STP, while those insisting upon interstate operation could receive their power.

4. The generation facilities of the STP cannot, at the current stage of construction, be converted to produce two types of electricity (intrastate and interstate); any regulation of the character of the electricity must occur when the power leaves the STP.

5. There is no competition among electric utilities in Texas or only de minimus competition to attract industrial customers

to locate plants or facilities in Texas electric utilities' service areas.

6. There is no competition among electric utilities in Texas or only de minimus competition to attract wholesale sales and purchases.

7. If plaintiffs are unable to retain their interconnections with defendants once plaintiffs begin to engage in completely interconnected, centrally dispatched operation with PSO and SWEP, plaintiffs might incur increased fuel costs but the evidence on this point is highly speculative, as is the amount of other increased costs plaintiffs might incur.

8. CPL has threatened breach of the STP and unless restrained will do so when the project is complete by connecting in interstate commerce while continuing to receive power from the STP, thus putting all of the participants in the STP involuntarily into interstate commerce.

9. Plaintiffs have failed to prove facts which could be the basis of an injunction against the defendants.

10. There is no substantial evidence of competition between defendants and plaintiffs in the following categories of so-called markets: franchise competition, interfuel competition, self-generation competition, wholesale competition, retail competition or retail competition for new industrial customers.

11. Plaintiffs failed to define the size, scope and geographic limits of any of their alleged relevant markets.

12. Plaintiffs failed to prove or even assert that Defendants were motivated by anticompetitive intent or purpose in deciding to disconnect from Plaintiffs on May 4, 1976 and thereby preserve the right to decide for themselves whether to commence interstate operations.

13. Plaintiffs failed to prove injury to competition as opposed to the highly speculative possibility of injury to themselves as "competitors".

14. In terms of threatened future harm, Plaintiffs' economic studies failed to demonstrate any significant competitive injury resulting from Defendant's alleged antitrust violations.

15. Since August 26, 1935 TESCO, TPL, DPL, HLP and others have independently pursued a policy of remaining in intrastate commerce, not subject to FPC control.

16. WTU's provision of electric service to customers located in the towns of Davidson, Frederick and Timpton, Oklahoma on May 4, 1976 and thereafter affected the reliability that HLP, TPL, TESCO and DPL were able to provide to their respective customers.

17. There is no evidence that the disconnection by each of the TU companies was the product of an agreement to disconnect. Indeed, all the evidence is that they did not have an agreement to disconnect in the event of interstate operation by any system connected with them.

18. The TU companies, while not severing connections with each other on May 4, 1976, did not do so in reliance upon any mutual understanding or agreement that each of the TU companies would operate only in intrastate commerce.

19. The electric utility industry in the United States currently consists of three separate interconnected groups: ERCOT, with a peak load of approximately 30,000 megawatts; the utilities generally west of the Rocky Mountains, with a peak load of approximately 70,000 megawatts and the utilities other than ERCOT members, generally east of the Rocky Mountains with a peak load of approximately 300,000 megawatts.

20. Any conclusion of law which is deemed to be a finding of fact is hereby adopted as such.

### Conclusions of Law

1. This court has jurisdiction of the parties and of the subject matter of this suit.

2. Although Plaintiffs and Defendants are not "jurisdictional" (being intrastate utilities) and not subject to FPC/FERC regulation, the Sherman Act § 1 "jurisdiction" extends to conduct which has or could likely have a substantial effect on interstate commerce, *Feminist Womens Health Center v. Mohammad,* 586 F.2d 530, 539 (5th Cir. 1978), and for purposes of jurisdiction the actions of Defendants could have a substantial effect on interstate commerce.

3. Venue is proper in this district.

4. The determination of TESCO and HLP to avoid the consequences of federal regulation does not constitute an unreasonable restraint of trade or an unlawful boycott in violation of the Sherman Act.

5. TESCO and HLP each have a right to restrict their operations to the State of Texas where they reasonably and in good faith believe that such operation is in the best interests of TESCO or HLP and in the best interests of their customers.

6. The interconnection agreements between TESCO and WTU do not constitute an unlawful conspiracy, combination or agreement in restraint of trade or an unlawful boycott in violation of the Sherman Act.

7. The interconnection agreement between TPL and HLP does not constitute an unlawful conspiracy, combination or agreement in restraint of trade or an unlawful boycott in violation of the Sherman Act.

8. The TIS agreement and the ERCOT agreement do not constitute an unlawful conspiracy, combination or agreement in restraint of trade or an unlawful boycott in violation of the Sherman Act.

9. The existence of cooperation and coordination among the electric utility systems of TIS and ERCOT operating interconnected and in electrical synchronism with each other solely within the state of Texas does not constitute an unlawful conspiracy, combination or agreement in restraint of trade in violation of the Sherman Act.

10. TPL, DPL and TESCO did not conspire in any manner to violate the antitrust laws, specifically § 1 of the Sherman Act.

11. TPL, DPL, and TESCO did not violate the Sherman Act § 1 when they disconnected from the Plaintiffs following the May 4, 1976 midnight wiring.

12. Defendants' actions on May 4, 1976 and following were reasonable when viewed in light of the intent and motivation of Plaintiff's parent corporation, the lack of any business purpose for the midnight wiring, the threats of force previously and consistently made by CSW and the Defendants' desire to remain in intrastate commerce, or to at least make a voluntary decision to enter interstate commerce.

13. The Public Utility Regulatory Policies Act of 1978 adds a new Section 210 to the Federal Power Act which gives FERC the authority to order an otherwise intrastate electric utility to interconnect with another electric utility where such interconnection with another electric utility is in the public interest and where the interconnection would encourage the overall conservation of energy or capital, optimize the overall efficiency of use of facilities and resources, or improve the reliability of any electric utility.

14. It would not be in the public interest to force the Defendants to interconnect in interstate commerce.

15. It would not encourage the overall conservation of energy or capital to force the Defendants to interconnect in interstate commerce.

16. It would not optimize the overall efficiency of the use of facilities and resources to force the Defendants to interconnect in interstate commerce.

17. It would not improve the reliability of any electric utility to force the Defendants to interconnect in interstate commerce, and would, in fact, decrease the reliability of the Defendants.

18. Any contractual prohibitions against interstate sales contained in the contracts

made between the parties regarding, for example, sales of economy power, etc., are not void or voidable, and are not per see or unreasonable violations of the Sherman Antitrust Act § 1; they are reasonable restrictions.

19. The actions of the Defendants do not run counter to the public policy declared in the Sherman and Clayton Acts.

20. The actions of the Defendants do not constitute unfair methods of competition.

21. The intrastate agreements and Defendants' actions do not foreclose a significant amount of potential competition.

22. The intrastate agreements and Defendants' actions do not create or maintain a situation inconsistent with the antitrust laws and do not significantly affect the parties' activities under the antitrust laws.

23. Defendants' attempts to petition the PUC, FPC, this court and other governmental bodies to preserve the current intrastate status of Defendants were and are genuine attempts to influence public officials to take governmental action and were not merely a sham to cover up an attempt to directly interfere with the business relationships of Plaintiffs.

24. Defendants' attempts to petition the PUC, FPC, this court and other governmental bodies to preserve the current intrastate status of Defendants were and are protected by the First Amendment. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad President's Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

25. There is no evidence that Defendants' petitioning activities in requesting the PUC, FPC, this court and other governmental bodies to preserve the current intrastate status of the Defendants was a "sham".

26. Plaintiffs are not entitled to injunctive relief under § 16 of the Clayton Act for the purpose of permanently restraining the Defendants from enforcing any written or oral contractual provision prohibiting the flow of electricity/electric energy in interstate commerce, and are not entitled to injunctive relief permanently restraining Defendants from disconnecting their systems from, or refusing to interconnect their systems with, those of Plaintiffs.

27. CPL has anticipatorily breached and CSW had caused CPL to anticipatorily breach the STP Agreement.

28. CPL has not yet breached the STP Agreement because the Project is not complete and no power is currently being generated or transmitted from that facility.

29. CPL is hereby permanently restrained from permitting power it receives from the STP to enter interstate commerce as long as CPL remains a participant in the STP agreement and as long as that Agreement remains in force.

30. Plaintiffs have not established irreparable injury to competition, an unlawful restraint of trade, a conspiracy in restraint of trade or an unlawful boycott at any time from 1935 to the present and are therefore not entitled to injunctive relief.

31. Any finding of fact which is deemed to be a conclusion of law is hereby adopted as such.

## APPENDIX B

The map, below, shows the general geographical outlines of the electric companies in the State of Texas and neighboring states. (Px 766)

1 DALLAS POWER & LIGHT CO.
2 COMMUNITY PUBLIC SERVICE CO.
3 SOUTHWESTERN ELECTRIC SERVICE CO.
4 CENTRAL POWER & LIGHT CO.
5 OKLAHOMA GAS & ELECTRIC CO.
6 GULF STATES UTILITIES CO.
7 SOUTHWESTERN ELECTRIC POWER CO.
8 PUBLIC SERVICE CO. OF OKLAHOMA
9 HOUSTON LIGHTING & POWER CO.
10 TEXAS ELECTRIC SERVICE CO.
11 EL PASO ELECTRIC CO.
12 WEST TEXAS UTILITIES
13 SOUTHWESTERN PUBLIC SERVICE CO.
14 TEXAS POWER & LIGHT CO.
15 NON–INVESTOR OWNED
16 OTHER INVESTOR OWNED

842

The map, below, is a more accurate depiction of the geographic service territories of West Texas Utilities and Texas Electric Service Company, showing also the areas served by both TESCO and WTU. TESCO # 305)

## APPENDIX D

The map, below, shows the current interregional interconnections in the United States. Each region is connected to at least two other regions and has at least 13 interconnections in the group of interconnected regions (excluding ERCOT and WSCC). ERCOT could only be connected to the Southwest Power Pool (only one region), and this would adversely affect the reliability of ERCOT because it would become an isolated "peninsula". All of these regions make up the National Energy Reliability Council (NERC).

The regions are: NPCC (Northeast Power Coordinating Council); MAAC (Middle Atlantic Area Reliability Council); SERC (Southeast Reliability Council); ECAR (Eastern Central Area Reliability Council); MAIN (Mid-America Interpool Network); SPP (Southwest Power Pool); MARCA (Mid-Continent Reliability Coordination Agreement); ERCOT (Electric Reliability Council of Texas); and WSCC (Western Systems Coordinating Council).

The numbers within the circles on the diagram/map indicate the number of interconnections between the regions. (TESCO #307)

N.O.—NORMALLY OPEN

PRESENT
INTERREGIONAL INTERCONNECTIONS

SOURCE: "REASONS FOR DIFFERENCES IN CRITERIA—SYSTEM DESIGN",
R. M. MALISZEWSKI, PRESENTED AT IEEE POWER ENGINEERING SOCIETY
1977 WINTER MEETING

844

## APPENDIX E

The diagram/map, below, shows the Texas Interconnected System, and its participants. The numbers within the circles indicate the number of interconnections among the TIS members.

The TIS members are: TPL (Texas Power and Light); HLP (Houston Power and Light); AUSTIN (City of Austin); LCRA (Lower Colorado River Authority); CPL (Central Power and Light); STEC/MEC (South Texas Electric Cooperative/ Medina Electric Cooperative); CPSB (Central Public Service Board of San Antonio); WTU (West Texas Utilities); BEPC/TMPA (Brazos Electric Power Cooperative/Texas Municipal Power Authority); DPL (Dallas Power and Light); and TESCO (Texas Electric Service Company). (TESCO #309)

**TEXAS INTERCONNECTED SYSTEM**
INTER-COMPANY INTERCONNECTIONS
SOURCE: TIS POWER TRANSFER STUDY.1978